Versión para imprimir


EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br>v.<br><br>Servidores Públicos Unidos de Puerto Rico (AFSCME)<br><br>Recurrida | Certiorari<br><br>2012 TSPR 58<br><br>185 DPR \_\_\_\_ |

Número del Caso: CC-2010-554

Fecha: 27 de marzo de 2012

Tribunal de Apelaciones:

      Región Judicial de San Juan, Panel II

Abogado de la Parte Peticionaria:

      Lcdo. Ángel Rotger Sabat

Abogado de la Parte Recurrida:

      Lcda. Genoveva Valentín Soto

Materia: Derecho Laboral – Aplicabilidad del aumento trienal dispuesto por la Ley 184-2004 a empleados sindicalizados cuando aún no se ha aprobado convenio colectivo; alcance de la jurisdicción de la extinta Comisión de Relaciones del Trabajo del Servicio Público

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br>Peticionario | Certiorari |
| v. | |
| Servidores Públicos Unidos de Puerto Rico (AFSCME)<br>Recurrida | CC-2010-0554 |

Opinión del Tribunal emitida por el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 27 de marzo de 2012.

El recurso de autos nos brinda la oportunidad de expresarnos sobre la aplicabilidad del aumento trienal dispuesto en la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184-2004 (3 L.P.R.A. secs. 1461 *et seq.*, en adelante Ley Núm. 184) a los empleados públicos sindicalizados cuando aún no se ha aprobado un convenio colectivo. Además, debemos determinar si al denegar a estos empleados dicho aumento, el patrono incurre en una práctica ilícita en el trabajo, de conformidad al Art. 9 de la Ley de Relaciones del Trabajo para el Servicio Público, Ley Núm. 45-1998 (3 L.P.R.A. secs. 1451 *et seq.*, en adelante Ley Núm. 45). De igual forma, nos

corresponde aclarar el alcance de la jurisdicción de la extinta Comisión de Relaciones del Trabajo del Servicio Público (Comisión). Esto, en consideración a la tesis del Departamento de Asuntos del Consumidor en la que sostiene que la Comisión no tiene facultad para interpretar las disposiciones de la Ley Núm. 184.

A continuación hacemos un recuento del trasfondo fáctico que dio génesis al asunto que hoy nos ocupa.

I

La Unión de Servidores Públicos Unidos de Puerto Rico (SPU), que está certificada como representante exclusivo de los empleados de la unidad apropiada del Departamento de Asuntos del Consumidor (DACo),[1] presentó ante la Comisión de Relaciones del Trabajo en el Servicio Público tres querellas alegando que esta agencia había violado el Art. 9, Sec. 9.1 (a) e (i) de la Ley Núm. 45.[2] Particularmente, arguyó que el DACo incurrió en prácticas ilícitas en el trabajo al denegar el aumento trienal que provee el Art. 8, Sec. 8.3 inciso 2 de la Ley Núm. 184 a cinco empleados por razón de estar sindicalizados. La SPU sostuvo que estos empleados tenían derecho al aumento

---

[1] La SPU está certificada como representante exclusivo de los empleados de esa unidad apropiada, a tenor con la Sec. 8.3, inciso 3 de la Ley Núm. 184-2004 (3 L.P.R.A. secs. 1461 et seq.) desde el 4 de mayo de 2005. Esta fue la certificación número 052 de la Comisión. **En agosto de 2007 entre DACO y SPU se firmó el Convenio Colectivo.** Véase el Alegato de la Recurrida en pág. 3.

[2] Se trataba de tres querellas (CA-06-111, CA-06-122 y CA-06-150) donde los empleados Jorge Rosa Hernández, Omar Rodríguez Rodríguez, Héctor Pérez Serrano, Carmen L. Villar Febo y Lymarie del Valle Pérez, hicieron una reclamación de aumento salarial. Por tratarse de la misma controversia, el 4 de abril de 2007 la Comisión decidió consolidar los casos.

trienal toda vez que el convenio colectivo se estaba negociando y por ende no había entrado en vigor.

En respuesta a las querellas instadas, el DACo reiteró que de conformidad a lo dispuesto en el Art. 8, Sec. 8.3 inciso 3 de la Ley Núm. 184,[3] los acreedores del aumento eran únicamente los empleados gerenciales y aquellos no sindicalizados. Así pues, señaló que no incurrió en práctica ilícita alguna, ya que el hecho de que el convenio colectivo estuviera en etapa de negociación, no implicaba que los querellantes no fueran empleados sindicalizados. En consecuencia, el DACo concluyó que al estar sindicalizados, los querellantes estaban excluidos del aumento reclamado. Además, planteó que la Comisión carecía de jurisdicción para interpretar la Ley Núm. 184 y dirimir la controversia del aumento.[4]

Luego de varios trámites procesales, el 17 de agosto de 2007 se celebró la vista en su fondo ante el Oficial Examinador de la Comisión. El 7 de mayo de 2008 este emitió un Informe y Recomendaciones, en el cual aconsejó a

---

[3] La sec. 1464b en su inciso 3 de la Ley Núm. 184, *supra*, dicta lo siguiente:

> Los empleados públicos no sindicados y gerenciales que hayan ocupado un puesto regular durante un período ininterrumpido de tres años de servicios, sin haber recibido ningún otro aumento de sueldo recibirán un aumento de hasta un cinco (5) por ciento de su sueldo o su equivalente en tipos intermedios. Para esto, el empleado debe haber provisto servicios satisfactorios durante el período de tres años según evidenciado en sus hojas de evaluaciones. La Autoridad Nominadora enviará una notificación escrita a todo empleado que no satisfaga esta consideración. La notificación incluirá las razones por las cuales no se le concede al empleado el referido aumento, y le advertirá de su derecho de apelar ante la Comisión Apelativa.

[4] Véase Apéndice de la Petición de *Certiorari*, pág. 123.

la Comisión declarar con lugar las tres querellas presentadas contra el DACo. Asimismo, el Oficial Examinador encontró a la agencia incursa en violación a la Ley Núm. 45. No obstante, recomendó la imposición de una multa de $3,000 por tratarse de una controversia novel.[5] En su informe, expresó que los empleados querellantes no estaban cobijados por un convenio colectivo, puesto que este se encontraba en la fase de negociación.[6] Consecuentemente, concluyó que en esa etapa del proceso los empleados querellantes estaban cubiertos por las disposiciones de la Ley Núm. 184. Ello así, hasta tanto no fuese firmado y ratificado el convenio colectivo que establecería los nuevos términos y condiciones de trabajo de los empleados sindicalizados.[7] También, determinó que el no concederle a esos empleados el aumento trienal tenía el efecto de desalentar a los empleados a unirse en sindicato. Por lo tanto, entendió que al así proceder, el DACo vulneró su derecho a la sindicalización en contravención a lo pautado en la Ley Núm. 45.[8]

Por su parte, el 2 de junio de 2008 el DACo presentó su alegato y solicitó que la Comisión no acogiera las recomendaciones del Oficial Examinador. Empero, el 19 de diciembre de 2008 la Comisión emitió una Decisión y Orden

---

[5] Íd. pág. 166.

[6] Íd. pág. 165.

[7] Íd.

[8] *Supra*, nota 5.

en la que resolvió que el DACo incurrió en una práctica ilícita a tenor con el Art. 9.1(a) e (i) de la Ley Núm. 45. Oportunamente, el 7 de enero de 2009 el DACo presentó una moción de reconsideración, la cual fue acogida por la Comisión. Subsiguientemente, el 4 de marzo de 2009 la Comisión emitió una resolución declarando no ha lugar la petición de reconsideración.

Inconforme con ese proceder, el DACo incoó un recurso de revisión judicial ante el Tribunal de Apelaciones. En esencia, la agencia reprodujo las alegaciones previamente enunciadas ante la Comisión.[9] Así las cosas, el 10 de marzo de 2010 el foro *a quo* confirmó mediante sentencia la resolución recurrida. En su dictamen, luego de indicar que los empleados querellantes estaban sindicalizados al momento de solicitar el aumento trienal, el foro apelativo intermedio esgrimió el mismo razonamiento avalado por la Comisión.[10] Es decir, sostuvo que desde el momento en que empieza a regir el convenio colectivo entre las partes, quedan desplazadas las leyes y reglamentos que aplican a los empleados bajo su contrato original de empleo.[11] En consecuencia, confirmó la interpretación de la Comisión de que la Ley Núm. 184 cobija a los empleados sindicalizados

---

[9] Véase Apéndice de la Petición de *Certiorari*, pág. 60.

[10] Íd. pág. 25.

[11] Íd. pág. 29. El foro apelativo citó la decisión de <u>Condado Plaza v. Asoc. Emp. Casinos P.R.</u>, 149 D.P.R. 347, 357 (1999) en la que expresamos que: "los derechos y obligaciones dimanantes de las leyes estatales que pueden ser renunciados o alterados mediante contrato, se encuentran desplazados por los propios convenios colectivos".

cuando aún se encuentran en el proceso de negociación de su primer convenio colectivo.

No conteste con el dictamen del foro intermedio, el DACo acude ante este Tribunal señalando los siguientes errores:

Erró el [Tribunal de Apelaciones] al confirmar la determinación administrativa de la Comisión al adjudicar las Querellas CA-06-111, CA-06-122 y CA-06-150 aplicando a empleados sindicados las disposiciones de la Ley 184 sobre el aumento de retribución por concepto del pago del trienio, por carecer de jurisdicción la Comisión para adjudicar esta controversia.

Erró el [Tribunal de Apelaciones] al confirmar la determinación administrativa de la Comisión al concluir que DACo incurrió en una práctica ilícita al amparo de las disposiciones de la Ley 45 por denegarle a los querellantes como empleados sindicados el aumento de retribución establecido en el inciso 3 de la Sec. 8.3 del Art. 8 de la Ley 184, 3 L.P.R.A. 1464b, por concepto del pago del trienio.

Erró este panel del [Tribunal de Apelaciones] al dictar la Sentencia recurrida en contra de lo resuelto por otros paneles del [Tribunal de Apelaciones], particularmente lo resuelto en Depto. del Trabajo v. Pilar Marrero García y otros, KLRA0800395, sosteniendo que la Ley 184 no aplica a empleados sindicados y por ende están impedidos de recibir el aumento trienal que establece dicha ley.

La interrogante que debemos dilucidar se circunscribe a determinar si en virtud de la Ley Núm. 184, los empleados sindicalizados que no tienen un primer convenio colectivo vigente son acreedores del aumento trienal. Adelantamos que a estos empleados no les aplica el referido aumento. Por considerar que la discusión del primer y el segundo señalamiento de error disponen

adecuadamente del presente recurso, se hace innecesario examinar el tercer planteamiento de error.

El 17 de diciembre de 2010 le ordenamos a la Secretaria de este Tribunal a expedir mandamiento de *certiorari*. Ambas partes han presentado sus respectivos alegatos. Contando con el beneficio de sus comparecencias, pasemos a resolver los errores en el orden en que fueron presentados.

II

**A. Jurisdicción**

El DACo aduce que la jurisdicción para dilucidar el caso le corresponde a la Oficina de Recursos Humanos del Estado Libre Asociado (ORHELA) y no a la Comisión[12]. No le asiste la razón. Veamos.

La jurisdicción es el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir los casos que se someten a su consideración. Rosa Belén Parrilla v. Departamento de la Vivienda y la Junta de Restructuración Fiscal, res. el 23 de enero de 2012, 184 D.P.R.___ (2012), 2012 T.S.P.R. 11. Los organismos administrativos, así como los foros judiciales,

---

[12] El Plan de Reorganización Núm. 2 aprobado el 26 de julio de 2010, fusionó la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público (CASARH) y la Comisión de Relaciones del Trabajo del Servicio Público (CRTSP) creando así lo que ahora se conoce como la Comisión Apelativa del Servicio Público (CASP). La CASP actúa como un organismo cuasi-judicial en la Rama Ejecutiva, especializado en asuntos obrero patronales y del principio de mérito atendiendo casos laborales, de querellas y de administración de recursos humanos, tanto para los empleados que negocian sus condiciones de trabajo al amparo de la Ley Núm. 45-1998 (3 L.P.R.A. sec. 1451 *et seq*.), como para los empleados públicos cubiertos por la Ley Núm. 184, *supra*. Igualmente, CASP atiende aquellos casos al amparo de la Ley Núm. 333 de 2004, según enmendada, conocida como la "Carta de Derechos de los Empleados de una Organización Laboral".

no tienen discreción para asumir jurisdicción donde no la hay. Íd.

De esta manera, las agencias administrativas solamente pueden ejercer los poderes que su ley habilitadora expresamente les ha otorgado y aquellos que sean indispensables para llevar a cabo su encomienda primordial. López Nieves v. Méndez Torres, 178 DPR 803 (2010); Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203 (2002). Así pues, la ley es el medio por el cual el legislador autoriza y le delega los poderes a la agencia administrativa para que actúe conforme a los fines perseguidos en esta. Íd. Por esta razón, una agencia no puede asumir jurisdicción sobre una actividad, materia o conducta cuando no está claramente autorizada por ley para ello. ASG v. Mun. San Juan, 168 D.P.R. 337 (2006). Es decir, ni la necesidad, ni la utilidad, ni la conveniencia pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. Martínez v. Rosado, 165 D.P.R. 582 (2005).

Por otro lado, dentro de los poderes delegados a una agencia administrativa por vía de su ley habilitadora, es posible una fusión entre facultades cuasi-legislativas y cuasi-judiciales. De esta forma, la agencia tendrá tanto el poder de reglamentar como el de adjudicar las controversias comprendidas en su área de especialización o expertise. Caribe Comms., Inc. v. P.R.T.Co., supra.

Cónsono con lo enunciado, aquella actuación administrativa que no obedezca el poder que le fue conferido mediante legislación debe ser catalogada como una *ultra vires*. Caribe Comms., Inc. v. P.R.T.Co., supra. En consecuencia, todos los actos u órdenes ejecutados por una agencia que se extralimitan de lo dispuesto en la ley habilitadora son erróneos y nulos. Íd.

En atención a ello, al revisar la jurisdicción de una agencia, hay que recurrir en primer lugar a su ley habilitadora; pues es esta la que define y delimita la extensión de la jurisdicción del organismo administrativo. Perfect Cleaning v. Cardiovascular, 162 D.P.R. 745 (2004). A esos efectos, el tribunal en su función revisora, determinará si la actuación administrativa se ajusta o no al poder delegado. Caribe Comms., Inc. v. P.R.T.Co., *supra*. Para ello, es preciso interpretar la ley orgánica de la agencia atisbando la intención legislativa y así asegurar el resultado que quiso el legislador. ASG v. Mun. San Juan, supra; Vázquez v. A.R.P.E., 128 D.P.R. 513 (1991).

De otra parte, la Ley Núm. 184 "cre[ó] un sistema de administración de los recursos humanos enteramente armónico con la negociación colectiva, cuyo objetivo primordial es aplicar, evaluar y proteger el principio de mérito en el servicio público".[13] Así, en aras de descentralizar el manejo de recursos humanos en el sistema

---

[13] 3 L.P.R.A. sec. 1461 c.

público, se dispuso que el sistema de recursos humanos sea administrado por las autoridades nominadoras.

Igualmente, el referido estatuto creó a ORHELA, ahora conocida como OCALARH,[14] para asesorar, ayudar y supervisar a las agencias no excluidas de la Ley Núm. 184, en la administración del sistema de recursos humanos. Además, este organismo debe auxiliar y asesorar a las agencias que le aplican las disposiciones de la Ley Núm. 45,[15] en todo asunto relacionado con los procedimientos de certificación de organizaciones sindicales y en cuanto a la negociación y administración de convenios colectivos en áreas relacionadas con los asuntos laborales.[16] Así también, le fueron delegadas facultades cuasi-legislativas dirigidas a reglamentar, modificar, promulgar o adoptar la normativa de aplicación general al sistema de recursos humanos en el servicio público para que se cumpla eficazmente con el principio de mérito.[17]

---

[14] Conocida ahora como la Oficina de Capacitación de Asesoramiento de Asuntos Laborales y de Administración de Recursos Humanos (OCALARH). Véase, Ley 133-2011 (3 L.P.R.A. 1461).

[15] Como veremos adelante, la Ley Núm. 45, *supra*, otorgó a los empleados de las agencias tradicionales del gobierno central el derecho a sindicalizarse y a negociar colectivamente.

[16] Conforme a lo establecido en su Ley habilitadora, ORHELA debe asesorar a las agencias regidas por la Ley Núm. 45, *supra*, en todo asunto relacionado con los procedimientos de certificación de organizaciones sindicales, en cuanto a negociación y administración de convenios colectivos en áreas relacionadas con los asuntos laborales. Igualmente, esta agencia está llamada a supervisar, ayudar y asesorar a las autoridades nominadoras en la administración del sistema de recursos humanos, comprendiendo las agencias constituidas como administradores individuales y aquellos empleados y organismos no excluidos por la Ley Núm. 184. 3 L.P.R.A. sec. 1461b.

[17] 3 L.P.R.A. sec. 1461b. Cabe señalar que, de no estar conforme con la interpretación que diera ORHELA de las disposiciones relativas a áreas esenciales o no esenciales al principio de mérito, a la retribución o

De otra parte, mediante la Ley Núm. 45, que concedió a los empleados de agencias tradicionales del gobierno central el derecho a organizarse colectivamente y a negociar convenios colectivos, se creó la Comisión de Relaciones del Trabajo en el Servicio Público. Entre los poderes y responsabilidades delegados por el legislador a la Comisión, figura la obligación ministerial de interpretar, aplicar y hacer cumplir las disposiciones de la Ley Núm. 45 en todo lo relativo a los procesos de organización, certificación y descertificación de organizaciones sindicales. De igual forma, esta legislación facultó a la Comisión para atender reclamaciones sobre prácticas ilícitas incurridas por la autoridad nominadora o por las organizaciones sindicales.[18] Depto. Estado v. U.G.T., 173 D.P.R. 93 (2008); Asociación de Maestros v. Comisión, 159 D.P.R. 81 (2003). Entre las acciones agenciales que se consideran como una práctica ilícita están las siguientes:

a) Intervenir, coartar o restringir a uno o más de sus empleados en relación con su decisión de ejercer o no los derechos reconocidos en esta Ley.

a disposiciones administrativas adoptadas por un administrador individual, existía la posibilidad de apelar a la entonces Comisión Apelativa de Administración de Recursos Humanos del Servicio Público dentro de un periodo de treinta (30) días. 3 L.P.R.A. sec. 1468 (derogada).

[18] Véase 3 L.P.R.A. sec. 1452t que faculta a la Comisión en su primer inciso a:
(a) Interpretar, aplicar y hacer cumplir las disposiciones de este capítulo en todo lo relativo a los procesos de organización, certificación, descertificación de organizaciones sindicales; en los procedimientos relacionados con la conciliación y arbitraje de negociaciones de convenios colectivos, en los procedimientos relacionados con prácticas ilícitas y en todos aquellos aspectos que este capítulo le delegue alguna actuación particular.

......

   i) Estimular o desalentar a los empleados a unirse a cualquier organización sindical o a participar en las actividades de la misma mediante discriminación al emplear, despedir, conceder permanencia en el empleo o en relación a otros términos o condiciones de trabajo. Art. 9, Sec. 9.1, 3 L.P.R.A. sec. 1452a.

De lo antes expuesto, se desprende que la Ley Núm. 45 antes de ser enmendada a los efectos de fusionar la Comisión, disponía que este organismo atendería toda querella sobre prácticas ilícitas en el trabajo realizadas por una agencia, organización sindical o sus miembros. Dentro de ese esquema, el análisis incidental de estatutos distintos a la Ley Núm. 45 no le resta de por sí jurisdicción a la Comisión. Como mencionáramos, en el caso de autos se presentaron tres querellas bajo el palio de las disposiciones sobre práctica ilícita. En atención a ello, la SPU adujo que el DACo desalentó la sindicalización de los empleados querellantes al negar el aumento trienal que dispone la Ley Núm. 184. Tratándose de la imputación de una práctica ilícita, lo cual es materia comprendida dentro de las facultades de la Comisión, resulta forzoso colegir que este organismo tenía la facultad para atender la controversia presentada ante su consideración. Conforme a lo anterior, concluimos que la evaluación de las disposiciones de la Ley Núm. 184 por parte de la Comisión fue necesaria.

Ahora bien, a la luz del marco fáctico que hemos enunciado, la Comisión se excedió en el límite de sus poderes al interpretar las disposiciones de la Ley Núm.

184 en el sentido contrario a la intención del legislador. Por ello, al aplicar el texto de la citada Ley fuera de los límites y el alcance impuestos por la Asamblea Legislativa, la Comisión actuó de forma *ultra vires* en su decisión agencial.

Conforme a lo expresado, resolvemos que la Comisión tenía jurisdicción para dilucidar el caso de autos en cuanto a la existencia de prácticas ilícitas por parte de DACo. Empero, no así al arrogarse una interpretación de la Ley Núm. 184 fuera de los parámetros establecidos por el legislador.

Resuelto el planteamiento jurisdiccional, procedemos a examinar el estado de derecho relacionado a las demás controversias formuladas ante este Tribunal.

**B. La sindicalización en el servicio público y la figura del convenio colectivo**

Nuestro ordenamiento jurídico le reconoce a la mayoría de los empleados, el derecho a unirse en organizaciones obrero-patronales y a negociar colectivamente. Mediante la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 mayo de 1945, 29 L.P.R.A. sec. 61 *et seq.*, se estableció por primera vez la política pública del Gobierno de Puerto Rico de fomentar la negociación colectiva para alcanzar el máximo desarrollo de la producción de nuestro país, los salarios y las condiciones de empleo adecuados para los obreros puertorriqueños. 29 L.P.R.A. sec. 62. C.O.P.R. v. S.P.U.,

181 D.P.R. 299 (2011). Esta Ley le concedió a los trabajadores de las agencias corporativas del gobierno que se dediquen o puedan dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario, el derecho a organizar sindicatos y a negociar colectivamente. Depto. Estado v. U.G.T., supra.

Posteriormente, con la aprobación de nuestra Constitución, en la Sec. 17 de la Carta de Derechos se consagró expresamente la garantía cardinal que ostenta todo empleado del sector privado y de ciertas agencias gubernamentales a la organización y a la negociación colectiva con su patrono. Art. II, Sec. 17, Const. P.R. 1 L.P.R.A., Tomo 1, ed. 2008, pág. 375. Específicamente, dicha sección prescribe que:

> Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar.

Ahora bien, el esquema constitucional no le reconoció a los empleados del gobierno central el derecho a organizarse y a negociar colectivamente. En ánimo de hacer extensivo este derecho de forma estatutaria, en 1998 se aprobó la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico (Ley Núm. 45). Esta legislación adoptó la política pública para reconocer el derecho a la organización sindical y a la negociación colectiva en el servicio público de Puerto Rico. Particularmente, el Art.

4 Sec. 4.1 de la citada Ley expresa que los empleados de las agencias del gobierno central tendrán el derecho a organizarse y afiliarse a organizaciones sindicales que estén certificadas por la Comisión como representantes exclusivas de los empleados.

A su vez, para que los empleados puedan sindicalizarse, es necesario que estos pertenezcan a una unidad apropiada, según determinada por la Comisión.[19] Recordemos pues, que la unidad apropiada constituye el "conjunto de empleos o puestos con características e intereses similares, agrupados para la negociación colectiva de términos y condiciones de empleo o para elegir al representante a tales efectos".[20] <u>A.E.E.   v. U.T.I.E.R.</u>, 170 D.P.R. 564, 571 (2007). Sin embargo, debemos puntualizar que existen ciertos empleos que por

---

[19] 3 L.P.R.A. Sec. 1451e.

[20] Bajo la Ley 45, la Comisión de Relaciones de Trabajo del Servicio Público era, entre otras cosas, el ente gubernamental encargado de determinar cuáles puestos de trabajo constituirían la unidad apropiada. <u>Depto. Estado v. U.G.T</u>, 173 D.P.R. 93. En la realización de esa encomienda se consideran criterios establecidos en la Ley, tales como:
     (a) Comunidad de intereses entre los empleados.
     (b) Evitar el fraccionamiento excesivo de las unidades.
     (c) Patrones actuales de organización formal e informal de los empleados.
     (d) Protección del pleno disfrute de los derechos reconocidos en la ley.
     (e) Viabilidad de las negociaciones.
     (f) Similitud funcional en requerimiento o condiciones del trabajo.
     (g) Sistema de personal establecido y planes de clasificación y retribución implantados en la agencia.
     (h) Acuerdo entre las partes. <u>Íd.</u>, pág. 103.

**razones de política pública** están excluidos de la unidad apropiada.[21]

La doctrina jurisprudencial ha reconocido que desde el momento en que se certifica la organización obrera, la unión queda autorizada como representante exclusiva de los empleados ante el patrono.[22] Ese proceso está contenido en la propia Ley Núm. 45 y particularizado en el Reglamento de la Comisión.[23] Esta regla establece el principio de que la certificación procede cuando una de las organizaciones sindicales obtenga el apoyo de la mayoría de los empleados de las unidades apropiadas que participen en votación secreta.[24] Es decir, la certificación es el instrumento por el cual los empleados autorizan a una organización

---

[21] Véase 3 L.P.R.A. sec. 1451d, donde se excluye de las unidades apropiadas los siguientes empleados:
   1) Empleados con nombramientos de confianza, transitorios, irregulares, por jornal y empleados confidenciales.
   2) Funcionarios sujetos a confirmación legislativa.
   3) Los supervisores de todas las agencias, según este término ha sido definido en esta Ley.
   4) Los empleados de la Comisión.
   5) Los empleados de la Oficina Central.
   6) Los empleados de la Oficina Propia del Gobernador y de unidades administrativas u oficinas adscritas que ejercen funciones confidenciales u ocupan puestos de confianza.
   7) Los empleados de la Oficina de Gerencia y Presupuesto.
   8) Los empleados que presten servicios para el Gobierno de Puerto Rico o para cualquiera de sus agencias o instrumentalidades en oficinas fuera de Puerto Rico.
   9) Los empleados de la Comisión Estatal de Elecciones.
   10) Los miembros de la Policía y la Guardia Nacional de Puerto Rico y los agentes, empleados y funcionarios del Departamento de Justicia.
   11) Los empleados de la Oficina de Ética Gubernamental.
   12) Organismos creados con un propósito específico por un término fijo.
   13)

[22] 3 L.P.R.A. sec. 1451j; Véase Asociación de Maestros v. Comisión, 159 D.P.R. 81, 89 (2003).

[23] Reglamento Núm. 7766 de la Comisión de Relaciones del Trabajo, Reglamento Núm. 6385 del Departamento de Estado, 28 de diciembre de 2001.

[24] 3 L.P.R.A. sec. 1451g; Véase Asociación de Maestros v. Comisión, supra.

sindical para que represente sus intereses frente al patrono, excluyendo la posibilidad de que cualquier otra organización los represente. Este proceso implica, sin duda, que una vez ocurre la certificación, los empleados que así deseen hacerlo se convierten en miembros de la unión y, por tanto, pasan a ser empleados sindicalizados.[25]

La pauta legislativa reconoce que cuando un empleado pertenece a una unidad apropiada, el afiliarse a una organización obrera certificada es opcional. En lo pertinente, el Art. 17 de la citada Ley Núm. 45 establece que:

> [a]quellos empleados que formen parte de una unidad apropiada para fines de negociación colectiva debidamente certificada por la Comisión, que opten por no afiliarse ni ser representados por la organización obrera debidamente certificada, podrán solicitar ser excluidos de la misma mediante presentación de una notificación al efecto al jefe de la agencia, con copia al representante exclusivo, dentro de los treinta (30) días siguientes a la notificación de la certificación del representante exclusivo. 3 L.P.R.A. sec. 1454.

A la luz de estos pronunciamientos, el derecho a organizarse colectivamente implica tanto la opción de afiliarse como la de no afiliarse a una organización sindical certificada.[26] De acuerdo a este esquema, el

---

[25] La definición de "empleado sindicado" resulta obvia y sencilla, la Real Academia Española define el término como aquel que pertenece a un sindicato.

[26] La Ley Núm. 96-2001 (3 L.P.R.A. 1454) incorporó a la Ley Núm. 45, *supra*, la opción de no afiliarse y estableció un nuevo cargo por servicio para los que opten por ejercerla. En lo pertinente, el Art. 17 expresa así:

> **Sec. 1454a. Cargo por servicio**
> Los miembros de la unidad apropiada que opten por no afiliarse pagarán al representante exclusivo un cargo por servicio hasta un máximo de cincuenta por ciento (50%) de la cuota regular establecida para los afiliados al

derecho de los empleados que forman parte de una unidad apropiada a no afiliarse a una unión, debe ejercerse dentro del periodo de los 30 días siguientes a la notificación de la certificación de la unión como su representante exclusivo.[27] Una vez transcurre el término de 30 días, el empleado se considera como uno sindicalizado si no ha ejercido su derecho a no afiliarse. Sin lugar a duda, esto último, **no depende de la vigencia de un convenio colectivo.**

Dentro de ese contexto, aquellos empleados que pertenecen a una unidad apropiada que decidan no afiliarse, disfrutarán de los servicios que provee el representante exclusivo en la negociación colectiva y en la administración de un convenio colectivo. Empero, el legislador dispuso que estos empleados deben contribuir pagando la mitad de la cuota regular que pagan los empleados sindicalizados.[28]

Asimismo, la Ley Núm. 45 define el convenio colectivo como "el acuerdo suscrito por las partes sobre salarios, beneficios marginales, términos y condiciones de empleo y otras disposiciones relativas a la forma y manera en que se desenvolverán las relaciones obrero patronales entre

---

representante exclusivo. También tendrán que observar las disposiciones del convenio colectivo en cuanto a los procedimientos para ventilar quejas, agravios y arbitraje, siéndole aplicables, en igual medida, las disposiciones del Convenio Colectivo referentes a salarios, beneficios marginales y condiciones de empleo. 3 L.P.R.A. sec. 1454a.

[27] 3 L.P.R.A. sec. 1454.

[28] *Supra*, nota 26.

las partes".[29] Este Tribunal ha reconocido que, ese acuerdo, como otros contratos, será la ley que regirá entre los empleados y el patrono, y será válido siempre que no contravenga la ley, la moral y el orden público. U.I.L., de Ponce v. Dest. Serrallés Inc., 116 D.P.R. 348, 352 (1985). La vigencia de tales convenios comienza a la fecha de su firma, luego de la ratificación por los miembros de la organización.[30] Su duración no podrá exceder de tres años, a no ser que se prorrogue por mutuo acuerdo y por un plazo definido.[31] Es importante señalar que la Ley Núm. 45 prohíbe además, la retroactividad de la vigencia de los convenios colectivos.[32]

Por otro lado, hemos sostenido que los empleados gerenciales o aquellos íntimamente ligados al quehacer gerencial, no pueden formar parte de la unidad apropiada y, por lo tanto, están impedidos de recibir los beneficios derivados de la negociación colectiva. A.A.A. v. Unión de Abo. A.A.A., 158 D.P.R. 273 (2002); N.L.R.B. v. Bell Aerospace, 416 U.S. 267 (1974). Esa limitación responde al estrecho vínculo que los une al patrono.[33] En consecuencia,

---

[29] 3 L.P.R.A. sec. 1451a.

[30] 3 L.P.R.A. secs. 1451m y 1451w.

[31] 3 L.P.R.A. sec. 1451x.

[32] Supra, nota 30.

[33] Los empleados gerenciales son aquellos que "(1) tienen ideas, intereses y actitudes alineadas con las de la gerencia; (2) formulan o determinan la política y las normas administrativas y gerenciales del patrono en el curso de su trabajo; y (3) ejercitan un alto grado de discreción para realizar su labor sin que tenga que conformarse a unas normas predeterminadas por el patrono." Véase, Departamento v. U.G.T., 173 D.P.R. 93 (2008) JTA. Relaciones Trabajo v. Conservatorio, 140

las condiciones de empleo, salarios y otros beneficios de aquellos empleados excluidos de la Ley Núm. 45, se regirán por los parámetros dispuestos por la Asamblea Legislativa. *Contrario sensu* y según hemos establecido, a los empleados incluidos en la unidad apropiada se les reconocen todos los derechos que emanan de la Ley Núm. 45 y del convenio colectivo negociado. A.E.E. v. U.T.I.E.R., 170 D.P.R. 564 (2007); J.R.T. v. A.M.A., 119 D.P.R. 94, 100 (1987).

## C. La Ley Núm. 184

De acuerdo al marco jurídico discutido, la Ley Núm. 184 creó un sistema retributivo para los empleados públicos en armonía con el principio de mérito, la sindicalización y las negociaciones colectivas realizadas en virtud de la Ley Núm. 45.[34] Obedeciendo las pautas dispuestas por esta medida, los organismos gubernamentales deben establecer los sueldos, así como otros beneficios relacionados al salario de sus respectivos empleados.

Cónsono con ello, la Ley Núm. 184 formuló "normas generales" de retribución aplicables a todas las agencias. Así también, estableció "normas específicas" destinadas únicamente a los empleados no sindicalizados, gerenciales

---

D.P.R. 407, 415-416 (1996); A. Acevedo Colom, Legislación de relaciones del trabajo comentada, Puerto Rico, 2007, pág. 110.

[34] La Ley Núm. 45, *supra*, así como la Ley Núm. 184, *supra*, están enmarcadas en el principio de mérito. Este principio se define como el "compromiso de gestión pública que asegura transacciones de personal donde todos los empleados de carrera deben ser seleccionados, adiestrados, ascendidos y retenidos en su empleo en consideración al merito y a la capacidad, sin discrimen por razón de raza, color, sexo, nacimiento, edad, origen o condición social, incapacidad física, incapacidad mental, condición de veterano, ni por sus ideas o afiliación política o religiosa." 3 L.P.R.A. sec. 1451a. Véase también, 3 L.P.R.A. sec. 1461.

y aquellos excluidos de la Ley Núm. 45.[35] Particularmente, el Art. 8 Sec. 8.3, Inciso 3 de la Ley Núm. 184 expresa así:

> Las siguientes normas sólo serán aplicables a los **empleados no sindicados**, gerenciales o empleados excluidos de la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, que laboran en el servicio público.
>
> ………
>
> (3) **Los empleados públicos no sindicados y gerenciales que hayan ocupado un puesto regular durante un período ininterrumpido de tres años de servicios, sin haber recibido ningún otro aumento de sueldo recibirán un aumento de hasta un cinco (5) por ciento de su sueldo o su equivalente en tipos intermedios.** Para esto, el empleado debe haber provisto servicios satisfactorios durante el período de tres años según evidenciado en sus hojas de evaluaciones. La Autoridad Nominadora enviará una notificación escrita a todo empleado que no satisfaga esta consideración. La notificación incluirá las razones por las cuales no se le concede al empleado el referido aumento, y le advertirá de su derecho de apelar ante la Comisión Apelativa. 3 L.P.R.A. sec. 1464b. (Énfasis nuestro.)

Al examinar tanto el texto, como el historial del referido precepto, se desprende claramente que la intención legislativa fue aprobar una norma específica aplicable única y exclusivamente a los empleados no sindicalizados, gerenciales o excluidos de la Ley Núm. 45. En torno a esta distinción, el legislador puntualizó que la Ley Núm. 184:

> [t]iene las normas retributivas generales que quedan de aplicación a las agencias **así como las normas de [sic] retributivas específicas que aplicarán solamente a los empleados no sindicados, gerenciales o excluidos de la Ley 45.** De hecho, fuimos bien, bien cuidadosos,

---

[35] 3 L.P.R.A. secs. 1464a-1464b.

señor Presidente, bien cuidadosos para que ninguna de las disposiciones de esta ley infringiera, trastocara, menoscabara, **los derechos adquiridos bajo la negociación colectiva a la que tienen derecho ahora los empleados públicos bajo la Ley 45 y de hecho, los líderes sindicales que fueron participes de la discusión de este proyecto, así lo reconocen, dieron sus sugerencias, propusieron cambios y se recogieron, de manera de garantizar, meridianamente claro, que no hay una disposición del Proyecto que vaya a inferir, a socavar, menoscabar, o violentar o cualquier convenio colectivo y cualquier derecho adquirido por los trabajadores que están sindicalizados y que negocian colectivamente.**

P. de la C. 3844, 7ma Sesión Ordinaria de la Asamblea Legislativa, 16 de julio de 2004, pág. 7.

Como puede observarse, las disposiciones de la Ley Núm. 184 tienen el fin "de diseñar un sistema retributivo compatible con la negociación colectiva que permita mantener una equidad y justicia al momento de implantar los procesos retributivos, **tanto para empleados unionados como para los no unionados, incluyendo a los gerenciales.**"[36](Énfasis nuestro.) Ello pues, los empleados no sindicalizados que no le aplican las disposiciones de la Ley Núm. 45 y los empleados gerenciales, necesitan igual justicia retributiva que aquellos que pueden beneficiarse de los acuerdos establecidos entre la unión que los representa y el patrono.

Como mencionáramos, ORHELA tiene entre sus funciones el deber de promulgar la normativa general del sistema de administración de recursos humanos en el servicio público.

---

[36] Véase el informe del sustitutivo del P. de la C. 3844 del 15 de julio de 2004, pág. 13.

Igualmente, debe asesorar a las agencias administradoras en materia de retribución de empleados. En relación a esta responsabilidad ministerial, esta agencia emitió la Carta Normativa 1-2005, que posteriormente se convirtió en el Reglamento 6939 del 3 de febrero de 2005 intitulado "Normas generales sobre retribución conforme a la Ley de la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico". Es de particular importancia mencionar que en la parte VII de ese Reglamento, se acentúa que la norma estatuida en la Sec. 8.3 de la Ley Núm. 184 **aplica solamente a los empleados no sindicalizados, gerenciales o empleados excluidos de la Ley Núm. 45, o sea, empleados que no ocupan puestos comprendidos en la unidad apropiada**. Además, el Reglamento aclara que la exclusión de los empleados comienza desde el momento en que se certifica a la unidad apropiada para fines de la negociación colectiva y se certifica la organización sindical como representante exclusiva de estos.[37] En lo pertinente, la referida normativa expresa lo siguiente:

> VII. Normas Retributivas Aplicables a Empleados que no ocupan puestos en unidades apropiadas
>
> Las siguientes normas sólo serán aplicables a los empleados no sindicados, gerenciales o empleados excluidos de la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, que laboran en el servicio público. Una vez la Comisión de Relaciones del Trabajo del Servicio Público

---

[37] Normas generales sobre retribución conforme a la Ley de la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Reglamento Núm. 6939 del Departamento de Estado, según enmendado, 3 de febrero de 2005, pág. 8.

certifica una unidad apropiada para fines de negociación colectiva y por consiguiente, certifica una organización sindical como representante exclusivo de los empleados, éstos quedan excluidos de las siguientes disposiciones. Estas normas retributivas tampoco serán aplicables a aquellos empleados quienes optaron por no afiliarse a la unión, pero cuyos puestos están comprendidos en las unidades apropiadas.

………

C. Aumento por Años de Servicio

Los empleados públicos no sindicados y gerenciales que hayan ocupado un puesto regular durante un período ininterrumpido de tres años de servicios, sin haber recibido ningún otro aumento de sueldo recibirán un aumento de hasta un cinco (5) por ciento de su sueldo o su equivalente en tipos intermedios. Para esto, el empleado debe haber provisto servicios satisfactorios durante el período de tres años según evidenciado en sus hojas de evaluaciones. La Autoridad Nominadora enviará una notificación escrita a todo empleado que no satisfaga esta consideración. La notificación incluirá las razones por las cuales no se le concede al empleado el referido aumento y le advertirá de su derecho de apelar ante la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Estado Libre Asociado de Puerto Rico. Reglamento Núm. 6939 del Departamento de Estado, 3 de febrero de 2005, pág. 8.

Es evidente que esta reglamentación es cónsona con la intención que tuvo el legislador al aprobar el P. de la C. 3844, que se convirtió en la Ley Núm. 184. En el Diario de Sesiones del referido proyecto se expresa que esta medida

armoniza, por primera vez, la Ley de Servicio Público con la Ley de Sindicación de los Empleados Públicos [Ley Núm. 45]. …[E]sta ley armoniza con la Ley 45 de forma y manera en que no haya choque entre la sindicación de los empleados públicos y los empleados que no están sindicalizados o empleados que no tienen derecho a sindicación pero que entonces le rige una ley protectora de sus derechos civiles, constitucionales, como trabajadores públicos.

P. de la C. 3844 de 16 de julio de 2004, 7ma Sesión ordinaria de la Asamblea Legislativa, pág.7.

Colegimos pues, que la razón legislativa para circunscribir el aumento trienal a estos empleados, es que aquellos que pertenecen a la unidad apropiada, a diferencia de los excluidos de esta, obtienen sus retribuciones, incluyendo los aumentos de salario, según las estipulaciones acordadas en el convenio colectivo.

III

Dentro del marco jurídico enunciado, pasemos al análisis y discusión de la controversia que nos ocupa.

Cuando el texto de la ley es claro y está libre de ambigüedad debemos aplicar la ley según su lenguaje. No debemos obviar su letra so pretexto de cumplir su espíritu. 31 L.P.R.A. sec. 14. Véase Rullán Rivera v. A.E.E., 179 D.P.R. 433, 444 (2010); Garriga Villanueva v. Mun. De San Juan, 176 D.P.R. 182 (2009). En tales casos, resulta innecesario auscultar la intención legislativa fuera del texto de la ley. El lenguaje inequívoco del legislador es la expresión por excelencia de toda intención legislativa. Íd.

De otra parte, la doctrina de revisión judicial consagra que las decisiones administrativas son objeto de deferencia judicial y se presumen correctas. Ifco Recycling v. Autoridad de Desperdicios Sólidos, res. el 27 de febrero de 2012, 184 D.P.R. ___ (2012), 2012 T.S.P.R. 35; Torres Santiago v. Depto. Justicia, 181 D.P.R. 969

(2011). Tal condescendencia judicial responde a la experiencia y conocimiento especializado atribuible a los organismos gubernamentales. Íd. Ahora bien, "las determinaciones de hechos realizadas por una agencia serán sostenidas por el tribunal, siempre que estas se basen en evidencia sustancial que obre en el expediente. **No obstante, las conclusiones de derecho serán revisables en toda su extensión.**"[38] A tales efectos, las conclusiones de derecho se sostendrán cuando se ajusten al mandato legislativo. Torres Santiago v. Depto. Justicia, supra.

Cónsono con lo anterior, la presunción de corrección de las decisiones administrativas cede cuando el foro administrativo abusa de su discreción al emitir una decisión que resulta ilegal, irrazonable o arbitraria. Mun. de San Juan v. CRIM, 178 D.P.R. 163 (2010). Así pues, se extralimita de su discreción aquel organismo administrativo que desobedece el mandato legislativo. Es por ello, que reiteradamente hemos sostenido que "cuando la interpretación del estatuto realizada por la agencia produzca resultados que son incompatibles o contrarios al propósito para el cual se aprobó la legislación y a su política pública, el criterio administrativo no podrá prevalecer". Ifco Recycling v. Autoridad de Desperdicios Sólidos, supra, pág. 49. En esos términos, el profesor Demetrio Fernández nos comenta que:

> [L]a deferencia judicial se abandona en aquellas instancias y circunstancias en que la

---

[38] 3 L.P.R.A. sec. 2175.

interpretación estatutaria es contraria al lenguaje o propósito expreso del estatuto. La acción administrativa que soslaya lo claramente establecido y pautado por el estatuto da lugar a que el tribunal deje sin efecto lo interpretado por el organismo administrativo. Además, si la interpretación adoptada por la agencia administrativa resultare en la declaración judicial de que … **el decreto administrativo implica un acto *ultra vires*, el tribunal procede a rechazar la interpretación substituyéndola con una que evite el confrontamiento con esos problemas.**[39] (Énfasis nuestro.)

En el caso de marras, la Comisión interpretó el alcance de la Ley Núm. 184 en manifiesta contravención al Reglamento de OREHLA y al propio mandato legislativo. Ambos preceptos legales excluyen a los empleados sindicalizados y los cobijados bajo la Ley Núm. 45 del aumento trienal. Al interpretar lo contrario, la decisión de la Comisión resulta ilegal e irrazonable. Según hemos observado, la Ley Núm. 184 armoniza el sistema de administración de recursos humanos con la negociación colectiva y sindicalización de los servidores públicos.

Al no conceder el aumento trienal a los empleados sindicalizados, el DACo cumplió con las pautas establecidas en la Ley Núm. 184 y el citado Reglamento de OREHLA. Nótese que los empleados a quienes les aplica la Sec. 8.3 de la Ley Núm. 184 están excluidos de la sindicalización y, por ende, no obtienen los beneficios retributivos que se establecen en el convenio colectivo.

---

[39] D. Fernández Quiñones, <u>Derecho administrativo y ley de procedimiento uniforme</u>, Ed. 2, Forum, 2001, págs. 559-560.

Las directrices establecidas por ORHELA a través de sus reglamentos, están dirigidas a todas las agencias y tienen la misma fuerza vinculante que la ley.[40] La Comisión no debió hacer abstracción de las disposiciones de la Ley Núm. 184, ni de la reglamentación aplicable, para imponer su propio criterio sobre el alcance de dicho estatuto. De modo arbitrario y caprichoso, la Comisión decidió que el aumento aplicaba a los empleados sindicalizados porque no tenían un convenio colectivo. Al así proceder, la Comisión se excedió de sus facultades y contravino lo dispuesto manifiestamente en el ordenamiento jurídico. Por consiguiente, nos vemos precisados a concluir que estas acciones fueron *ultra vires* y nulas. De igual modo, incidió el foro apelativo intermedio.

Además y acorde con lo intimado, es forzoso colegir que DACo no incurrió en práctica ilícita alguna. Los empleados en cuestión pertenecían a una unidad apropiada. Incluso, estaban afiliados a la SPU, una organización obrera debidamente certificada por la Comisión, por ello eran empleados sindicalizados. Si aváláramos la interpretación de la Comisión confirmada por el Tribunal de Apelaciones, estaríamos resolviendo contrario a la política pública declarada expresamente en la Ley Núm. 184 y en el Reglamento Núm. 6939 de OREHLA. Igualmente y según hemos establecido, las disposiciones de la normativa vigente excluyen a todo empleado cobijado bajo la Ley Núm.

---

[40] Íd. pág. 53.

45 del beneficio del aumento trienal. Se colige pues, que este aumento no es aplicable a aquellos que pertenecen a una unidad apropiada y que, ejerciendo su derecho a no afiliarse, conservan el estado de empleados no sindicalizados. Por lo tanto, en vista de que incluso el empleado que pertenece a una unidad apropiada y no se ha sindicalizado tampoco es acreedor del aumento trienal, no podemos concluir que una autoridad nominadora que deniega dicho aumento a estos empleados está desalentando su sindicalización. Ello pues, el hecho de que se sindicalicen o no, no hará a los empleados acreedores del aumento en cuestión. Este está dirigido a una población específica que por las características de su empleo se diferencia, entre otras cosas, por no poder recibir los beneficios de una negociación colectiva.

Para fundamentar sus dictámenes, la Comisión y el tribunal *a quo* citan el caso de <u>Condado Plaza v. Asoc. Emp. Casinos P.R.</u>, 149 D.P.R. 347, 357 (1999) en el que expresamos que "los derechos y obligaciones dimanantes de las leyes estatales que pueden ser renunciados o alterados mediante contrato, se encuentran desplazados por los propios convenios colectivos". Tal caso es distinguible y no es de aplicación a la controversia de marras. Según lo dicta explícitamente la Ley Núm. 184, los empleados sindicalizados y aquellos cobijados bajo la Ley Núm. 45 no son acreedores del aumento trienal. Así pues, resolvemos que el foro apelativo intermedio y la Comisión incidieron

al apartarse y obviar el texto claro de la referida legislación. Por consiguiente, no se puede desplazar un derecho que nunca se tuvo.

Como enfatizamos antes, la legislación aplicable diáfanamente preceptúa que incluso a aquellos empleados que pertenecen a una unidad apropiada y han ejercido su derecho a **no unionarse no cualifican para recibir el aumento trienal.** Entonces, aunque no se sindicalicen estarán en la misma situación: en la de recibir los eventuales beneficios derivados de una negociación colectiva. Esto es necesario aclararlo, incluso con letras mayúsculas y hasta la saciedad. Aquí no se está colocando al empleado unionado en una peor situación. Ello porque el empleado que pertenece a una unidad apropiada, aunque no pase a formar parte de la unión, no puede recibir el aumento trienal. En otras palabras, si se reconoce y acepta la intención legislativa, la afiliación a una organización sindical es un hecho irrelevante a los efectos de recibir el aumento trienal.

Se trata, pues, de una consideración *sui generis* para los empleados que ocupan puestos de trabajo que *por* **razones de política pública** no son aptos para organizarse y negociar colectivamente; como tampoco para recibir los beneficios derivados de la negociación.

El que se espere determinado tiempo para que se otorgue el primer convenio colectivo, en nada afecta la interpretación y aplicación de la Ley conforme a su

propósito. La exclusión del legislador de estos empleados del aumento trienal fue expresa y así se deriva de la intención legislativa y el historial de la Ley Núm. 184, guste o no. Resulta lógico y razonable que se haya hecho esa diferenciación en consideración al puesto de trabajo y a la posibilidad que se tiene de poder organizarse colectivamente para negociar las condiciones de trabajo con el patrono. La "gracia legislativa" que la Ley Núm. 184 concede a los empleados gerenciales y a aquellos excluidos de la Ley Núm. 45, no es otra cosa que el reconocimiento de la limitación de estos empleados para luchar por mejores condiciones laborales cara a cara con el patrono.

Mediante la negociación, los empleados sindicalizados reciben mayores beneficios y protecciones. Por lo tanto, el "limbo" del cual se habla que quedarían estos de no recibir el aumento trienal, no es más que una hipótesis infundada. Es improcedente reclamar tener derecho sobre un aumento que está dirigido a un grupo específico de trabajadores, so pretexto de que es política pública que el empleado sindicalizado esté mejor en todo momento. Es nuestro criterio que la política pública a favor de la negociación se encuentra en armonía con la intención legislativa de promover aumentos a un grupo específico, en consideración a su imposibilidad de negociar y recibir los beneficios derivados de esa ventaja. Es imperativo puntualizar que el hecho de que no haya un primer convenio

no quita que estos empleados estuvieran en vías de concretarlo.

Así pues, permitir que empleados que pertenecen a una unidad apropiada reciban el aumento dispuesto para los empleados gerenciales y aquellos que no les aplica la Ley Núm. 45, sería trastocar la intención del legislador y también la estabilidad financiera del gobierno. Mediante nuestro proceder no se promueve el trastorno del ordenamiento laboral. Todo lo contrario. La política pública a favor de la sindicalización subsiste y en nada se menoscaba por nuestra adhesión a la intención de la Ley Núm. 184, la cual, a su vez, se complementa con las disposiciones estatutarias que promueven la negociación colectiva.

## IV

Por los fundamentos expuestos, revocamos en parte la sentencia emitida por el Tribunal de Apelaciones. El aumento no es de aplicación a los empleados querellantes por estos no estar en el grupo al que van dirigidas las "normas específicas" de la Sec. 8.3 de la Ley Núm. 184. No obstante, confirmamos la sentencia del Tribunal de Apelaciones en lo concerniente a la jurisdicción de la Comisión para atender las querellas que fueron presentadas alegando el uso de una práctica ilícita en el ámbito obrero patronal.

Se dictará sentencia de conformidad.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>     Peticionario<br><br>       v.<br><br>Servidores Públicos Unidos de Puerto Rico (AFSCME)<br><br>     Peticionario | Certiorari<br><br><br><br><br><br>CC-2010-0554 |

SENTENCIA

San Juan, Puerto Rico, a 27 de marzo de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, revocamos en parte la Sentencia emitida por el Tribunal de Apelaciones. Ello, en cuanto a la determinación de que los empleados querellantes son acreedores del aumento trienal que dispone la Sec. 8.3 de la Ley Núm. 184-2004 (3 L.P.R.A. sec. 1461), por razón de no existir un primer convenio colectivo. No obstante, confirmamos la Sentencia en lo relativo a que la Comisión de Relaciones del Trabajo del Servicio Público tiene jurisdicción para atender las querellas de práctica ilícita en el ámbito obrero patronal.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta disiente con Opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Departamento de Asuntos del Consumidos
          Peticionario

          v.

                                        CC-2010-554

Servidores Públicos Unidos de Puerto Rico (AFSCME)
          Recurrido


Opinión Disidente emitida por la Jueza Asociada señora Fiol Matta


En San Juan, Puerto Rico, a 27 de marzo de 2012.

La Opinión que hoy emite el Tribunal debilita la política pública constitucional y estatutaria a favor de la organización sindical y la negociación colectiva pues, por primera vez en la historia de nuestro ordenamiento laboral, se coloca a un trabajador sindicalizado en una posición peor a la que tendría si no se hubiera organizado. Para ello, la mayoría se embarca en una senda de naturaleza, más que textualista, incomprensiblemente literal, que provoca un resultado absurdo contrario a lo previsto por la Asamblea Legislativa. Al así hacer,

olvida que todo texto tiene su contexto y que los tribunales tenemos el deber de interpretar las leyes teniendo en mente cuál fue el mal social que la rama legislativa quiso atender. En este caso, al aferrarse al texto de una porción de la ley, el Tribunal transforma el esquema legislativo diseñado para disminuir la brecha entre los empleados públicos no unionados y los que se han organizado sindicalmente. Desvirtúa de esa forma el propósito mismo de la negociación colectiva, que es, en pocas palabras, establecer las condiciones jurídicas para que los trabajadores puedan conseguir colectivamente más de lo que tendrían individualmente.

Coincido con la mayoría del Tribunal en su discusión sobre la figura de la unidad apropiada, su conclusión de que un trabajador se considerará "sindicalizado" cuando la unión que lo representa haya sido certificada, independientemente de si se ha firmado un convenio colectivo, así como su análisis general sobre los convenios colectivos y los empleados gerenciales. De igual forma, coincido con su conclusión de que el foro con jurisdicción en este caso es la Comisión de Relaciones del Trabajo en el Servicio Público. Pero disiento enérgicamente de su conclusión de que el aumento trienal establecido por la Ley Núm. 184 de 3 de agosto de 2004 para los empleados no unionados o gerenciales no le aplica a aquellos

trabajadores sindicalizados <u>que aun no han alcanzado su primer convenio colectivo</u>, y, por tanto, <u>aún están en la misma posición que sus contrapartes no unionados.</u>[41]


I

Mediante el artículo 8.3 de la Ley Núm. 184, la Asamblea Legislativa atendió un problema muy particular, que sirve de eje a todo el esquema retributivo en dicho estatuto: la creciente brecha entre la remuneración recibida por los trabajadores sindicalizados y la que reciben los empleados no unionados en las agencias del gobierno central. Partiendo de la premisa de que un trabajador sindicalizado tiende a recibir mayores beneficios económicos que un empleado no unionado, la legislatura quiso evitar que esa diferencia fuese tan marcada como para constituir una injusticia salarial para los servidores públicos que, por la razón que fuese, no se hubieran organizado sindicalmente y negociado colectivamente. Para ello, la Asamblea Legislativa adoptó un remedio muy específico: otorgar un aumento de cinco por ciento del salario a aquellos empleados públicos no sindicalizados o gerenciales que hubiesen ocupado un puesto regular durante un

---

[41] 3 L.P.R.A. sec. 1461 *et seq.*

período ininterrumpido de tres años de servicio, sin haber recibido algún otro aumento de sueldo.[42]

Bajo este esquema, los trabajadores sindicalizados recibirían sus aumentos salariales como producto de sus negociaciones que culminarían en un convenio colectivo vinculante, mientras que los empleados no unionados recibirían un aumento mínimo de cinco por ciento en un periodo de tres años por gracia legislativa. Evidentemente, el diseño legislativo tenía como punto de partida la diferencia entre el salario de un trabajador sindicalizado y el de un empleado no unionado; premisa que no opera en el caso de autos, pues aquí ambos grupos de trabajadores están en la misma posición salarial, ya que los empleados sindicalizados aún no han podido negociar su primer convenio colectivo.[43] De igual forma, el vínculo estrecho entre la Ley Núm. 184 y la Ley Núm. 45 de 25 de febrero de 1998, estatuto que extendió el derecho de organizarse sindicalmente y negociar colectivamente a los empleados del gobierno central,[44] confirma que el fin deseado por la Asamblea Legislativa era acortar la distancia

---

[42] Artículo 8.3 de la Ley Núm. 184; 3 L.P.R.A. sec. 1464b(3).

[43] Este hecho es altamente significativo, pues hay una diferencia notable entre estos trabajadores y aquellos empleados sindicados cuyas negociaciones están aún en proceso, pero ya están cobijados por un convenio colectivo anterior.

[44] 3 L.P.R.A. sec. 1451 *et seq*. Véase Exposición de Motivos, Ley Núm. 184. Leyes de Puerto Rico 2004, pte. 1, a las págs. 1124-25.

que pudiera existir, en términos salariales, entre el empleado no unionado y el trabajador sindicalizado.

Lo anterior surge con claridad del historial legislativo de la Ley Núm. 184, así como de la intención legislativa plasmada en la Exposición de Motivos.[45] Según la Exposición de Motivos de la Ley Núm. 184:

> Mantenemos presente que la negociación colectiva afectará la retribución de alrededor del 75% de los empleados públicos. Este número es sustancial y <u>repercutirá en la retribución del 25% de los empleados que son excluidos de la Ley Núm. 45</u>. Desde tal perspectiva, <u>es imprescindible diseñar un sistema retributivo en consonancia con la Ley Núm. 45</u> y el presupuesto del Estado Libre Asociado de Puerto Rico, de manera que la Autoridad Nominadora de cada agencia, donde los empleados hayan optado por la negociación colectiva y se hayan organizado sindicalmente, pueda <u>mantener la uniformidad y justicia</u> al momento de implantar los procesos retributivos, tanto para los empleados sindicados como los no sindicados, incluyendo a los gerenciales.[46]

Esta expresión de la voluntad legislativa fue una constante en el desarrollo de la Ley Núm. 184, tal y como se desprende del historial previo a su aprobación final, particularmente el "Informe en

---

[45] La Opinión mayoritaria hace referencia "tanto [al] texto como [al] historial" de la ley para fundamentar su conclusión, pero obvia el <u>objetivo</u> legislativo que surge de ese mismo historial en cuanto a acortar la brecha salarial entre los empleados públicos. Opinión mayoritaria a la pág. 21. En ese sentido, la mayoría comete el error de leer el Artículo 8.3 aislándolo de su propósito.

[46] (Énfasis suplido) Exposición de Motivos, Ley Núm. 184, a la pág. 1126.

torno al Sustitutivo al P. de la C. 3844". Según éste:

> La negociación colectiva impacta directamente el sistema retributivo y afectará la retribución de alrededor del 75% de los empleados del sector público. Este número es sustancial y <u>tendría un efecto en la retribución del 25% de los empleados que son excluidos de la Ley Núm. 45 del 25 de febrero de 1998</u>. En ese sentido, <u>se hace indispensable diseñar un sistema retributivo en consonancia con la Ley Núm. 45</u>.[47]

Es decir, la Asamblea Legislativa diseñó el artículo 8.3 de la Ley Núm. 184 muy cuidadosa y deliberadamente, identificando claramente dos hechos importantes. En primer lugar, el que una gran cantidad de empleados públicos se organizarían sindicalmente bajo la Ley Núm. 45 y que estarían, eventualmente, amparados por un convenio colectivo. En segundo lugar, que se produciría una brecha salarial entre estos empleados y aquellos trabajadores que no se beneficiarían de un contrato colectivo, ya fuese porque eran gerenciales y no podían organizarse sindicalmente o porque optaran por no ejercer ese derecho estatutario. Por tanto, para lograr un balance entre la realidad salarial de estos servidores públicos, la Asamblea Legislativa estableció el aumento trienal. De esa manera, los empleados no unionados no quedarían en una posición demasiado distante de sus compañeros

---

[47] (Énfasis suplido) Informe en torno al Sustitutivo al P. de la C. 3844 de 15 de julio de 2004, a la pág. 6.

servidores públicos organizados sindicalmente.[48]

Esto, como parte de un esquema amplio que actualizó el sistema de personal en el gobierno central de manera que se atendiera la brecha aludida. Según surge del "Informe en torno al Sustituto", a raíz de la aprobación de la Ley Núm. 45, "[s]e hizo necesaria una revisión de todos los aspectos del sistema de personal para restablecer el principio de mérito y proporcionar un esquema retributivo moderno justo, equitativo y armonizado con la negociación colectiva".[49] Es decir, hacía falta atender el sistema de retribución ante el hecho de que a partir de ese momento muchos empleados públicos se organizarían sindicalmente y recibirían mayores beneficios producto de la negociación colectiva.

No podemos minimizar la amplitud del esquema legislativo aprobado en la Ley Núm. 184. Se trata de un acercamiento abarcador al tema de la retribución en el empleo público. El artículo 8.3

---

[48] Esta realidad puede observarse a través de todo el historial legislativo de la Ley Núm. 184. Véanse las págs. 4-7 y 13 del Informe del Sustitutivo del P. de la C. 3844. El informe utiliza expresiones como "establecer un sistema de personal compatible y armonizable con la negociación del sector público donde existía", *Id* a la pág. 4; en esa ocasión, en el contexto de las medidas legislativas previas a la aprobación de la Ley Núm. 45. Es decir, se han vinculado consistentemente los sistemas retributivos bajo las leyes de personal con la negociación colectiva. En otras partes del historial se hace constante referencia a conceptos como la "equidad salarial", *Id* a la pág. 5.

[49] (Énfasis suplido) *Id*, a la pág. 7.

atiende específicamente la diferencia entre trabajadores sindicalizados y empleados no unionados en el gobierno central. El historial legislativo demuestra que el estatuto es parte de un andamiaje más amplio que incluye la disminución de la brecha salarial existente en otras áreas. A modo de ejemplo, el "Informe en torno al Sustitutivo" expresa que "[o]tra consideración que dio margen al desarrollo de estas leyes [de personal] fue la <u>diferencia substancial</u> entre los salarios del sector privado y las corporaciones públicas frente los que recibirían los empleados públicos en el gobierno central".[50] En otras palabras, mientras se atendía la diferencia salarial entre empleados del gobierno central y los demás sectores de nuestra economía, al interior del gobierno central también se atendió la brecha entre los empleados sindicalizados y los no unionados. Ese mismo informe manifiesta que "[el] sistema de retribución debe proveer mecanismos justos tanto para el personal no sindicado y excluido, como para el sindicado <u>que se atiende mediante la negociación colectiva</u>".[51]

Evidentemente, la Asamblea Legislativa identificó la desigualdad entre un trabajador sindicalizado con un salario más alto, <u>producto de la negociación colectiva</u>, y un empleado no

---

[50] (Énfasis suplido) *Id*, a la pág. 5.
[51] (Énfasis suplido) *Id*, a la pág. 7.

unionado. Más aun, la ley presupone, en todo momento, que se ha llevado a cabo una negociación colectiva que produce un salario mayor. Zanjar esta desigualdad entre el producto de la negociación colectiva y el producto de los planes administrativos de retribución es el propósito expreso del artículo 8.3. No obstante, la mayoría invierte el diseño legislativo de manera que el trabajador sindicalizado que aún no ha podido negociar su primer convenio colectivo queda en peor posición que si no se hubiese sindicalizado.

Esto es totalmente incongruente con nuestro ordenamiento laboral. Nuestra jurisprudencia ha reconocido consistente y reiteradamente que mediante la organización sindical y la negociación colectiva un trabajador puede quedar en mejor posición, pero nunca en una peor, que si no se hubiese sindicalizado.[52] No podemos pasar por alto

---

[52] *Véase*, por ejemplo, C.O.P.U. v. S.P.U., 180 D.P.R. 299 (2011). En ese caso, resolvimos que un árbitro que atendía una controversia sobre despido injustificado, al amparo de un convenio colectivo que establecía que debía ser interpretado y aplicado conforme a derecho y que callaba en cuanto a los poderes remediales del árbitro, no podía dar más del mínimo aplicable a los trabajadores no unionados cobijados únicamente por la legislación protectora del trabajo. En ese contexto, manifestamos que "[e]sto es cónsono con la política pública a favor de la negociación colectiva, ya que son las partes y no el árbitro o los tribunales las que han pactado adherirse al mínimo que ofrece nuestro ordenamiento jurídico, sin más". (Énfasis suplido) *Id*, a la pág. 335. De esta manera reconocimos que un trabajador organizado siempre estará protegido, mínimamente, por los beneficios otorgados a los empleados no unionados. En C.O.P.U v. S.P.U. expresamos que "[l]a Ley Núm. 130 [de Relaciones del Trabajo]

que, si a un empleado ordinario le aplican todas las gracias legislativas, las que quedan incorporadas automáticamente en todo contrato de trabajo,[53] independientemente de la existencia de un convenio colectivo, y el patrono tiene una obligación estatutaria de negociar de buena fe, no es posible que un empleado sindicalizado quede en peor posición a si no se hubiera sindicalizado.

## II

La situación que nos presenta el caso de autos no fue anticipada por la Asamblea Legislativa cuando aprobó la Ley Núm. 184. Se trata de un grupo de servidores públicos del gobierno central que han ejercido su derecho a organizarse sindicalmente y negociar colectivamente con miras a producir un primer convenio colectivo. Dicho proceso de negociación

---

concede al patrono y a la unión la oportunidad de ensanchar la protección mínima que ofrece la Ley Núm. 80…Mediante la negociación colectiva, las partes pueden pactar en el convenio que el empleado reciba mayores beneficios y protecciones con relación a su seguridad de empleo". (Énfasis suplido) *Id*, a la pág. 338. En varias ocasiones en ese caso hicimos referencia a que mediante convenio se puede ampliar "más allá de lo mínimo". *Id*. Véase, *Id*, Opinión Disidente de la Jueza Asociada Fiol Matta, a la pág. 353. Además, en J.R.T. v. Vigilantes, Inc., 125 D.P.R. 581 (1990) resolvimos que un contrato laboral, ya fuese colectivo o individual, siempre puede dar más que lo establecido por gracia legislativa, pero nunca menos.

[53] J.R.T. v. Vigilantes, Inc., *supra*, a la pág. 592.

aún no había culminado cuando solicitaron el aumento trienal, al que tenían derecho todos los empleados que, como ellos, llevaban tres años sin aumento salarial. Es cierto que los demandantes son trabajadores sindicalizados, lo cual, si nos aferremos al texto, parecería excluirlos del alcance del artículo 8.3 de la Ley Núm. 184. Ahora bien, como hemos visto, la razón de la exclusión no fue el hecho de la sindicalización sino que la legislatura presumió que los empleados estarían cobijados por un convenio colectivo que ofrecería mejores beneficios y condiciones y por eso no necesitarían el aumento trienal. Es decir, que estarían en mejor posición que los empleados no unionados, a quienes se les otorgaría el referido aumento para acercarlos a la situación salarial de los trabajadores sindicalizados. Resulta incontrovertible que la Asamblea Legislativa no anticipó una situación en la que el aumento trienal resultara en una mejor posición para el empleado no unionado frente al trabajador sindicalizado, pues tal desenlace contradice la esencia misma de la negociación colectiva y derrotaría la política pública, constitucional y estatutaria, a favor de dicho proceso.

En ese sentido, coincido plenamente con la conclusión del Tribunal de Apelaciones en este caso que señala, acertadamente, que el elemento fundamental en esta controversia es que estos

empleados públicos, aunque se han sindicalizado, aún no han logrado su primer convenio colectivo. Por tanto, aún no han podido conseguir beneficio mayor alguno al establecido por la vía legislativa. Ahora, según la Opinión mayoritaria, tampoco podrán recibir el aumento trienal de la Ley Núm. 184. Como correctamente expresó el foro apelativo: "El fin de la negociación colectiva es conseguir mayores beneficios para los empleados unionados que los que proveen las leyes aplicables, las que usualmente proveen beneficios mínimos que, de ordinario, son mejorados mediante la negociación colectiva…Lo contrario sería colocar a estos empleados en un limbo laboral durante el periodo entre la certificación de la Unión como representante exclusivo y la fecha de la ratificación del primer convenio colectivo".[54]

En este caso no hace falta ignorar el texto de la ley con el fin de "cumplir su espíritu".[55] Se trata de identificar cuál fue el mal social que la Asamblea Legislativa pretendió atender al aprobar este esquema retributivo, de manera que no se produzca un resultado absurdo y diametralmente contrario a lo anticipado por la legislatura. Como adelantara, no estamos ante una situación prevista por la legislatura. Más bien, se trata de una situación anómala. Los empleados públicos no

---

[54] Sentencia del Tribunal de Apelaciones, a las págs. 13-14.

[55] Opinión mayoritaria, a la pág. 25.

unionados, así como los gerenciales, reciben un aumento salarial producto de la gracia legislativa plasmada en la Ley Núm. 184. Por su parte, los trabajadores sindicalizados que ya gozan de un convenio colectivo vigente están cobijados por las condiciones allí establecidas. Son los trabajadores sindicalizados que aun no han negociado su primer convenio los que quedan en el "limbo".

Ante esta situación, el Tribunal tenía dos opciones. En primer lugar, negarle a los demandantes el aumento trienal establecido por el artículo 8.3 de la Ley Núm. 184 y dejarlos en una posición peor a la que hubiesen tenido si no se hubiesen sindicalizado. La mayoría ha escogido esta opción. En sentido contrario, el Tribunal podría reconocer que se trata de un caso anómalo y extender el aumento a estos trabajadores, de manera que no se produzca lo que la legislatura quiso evitar. Desafortunadamente, la mayoría se aferra ciegamente a las palabras escuetas de la ley, produciendo un resultado contrario al propósito legislativo, trastornando nuestro ordenamiento laboral y derrotando la política pública. Nuevamente, son los servidores públicos los que sufren las consecuencias de nuestros errores. Disiento.

Liana Fiol Matta<br>
Jueza Asociada