CT-1995-9                                                    1

En el Tribunal Supremo de Puerto Rico

| Condado Plaza Hotel & Casino  Recurrido  V.  Asociación de Empleados de Casinos de Puerto  Rico  Recurrente | Certificación  99 TSPR 148 |
| --- | --- |

Número del Caso: CT-1995-0009

Abogado de la Parte Recurrente:     Lcdo. José E. Carreras Rovira

Abogados de la Parte Recurrida:     Lcdo. Herber E. Lugo Rigau
                                    Lcdo. Jorge J. Puig Jordán
                                    Lcdo. Miguel Palou Sabater
                                    Lcdo. Luis E. Palou Balsa

Tribunal de Primera Instancia, Sala Superior de San Juan

Juez del Tribunal de Primera Instancia: Hon. Flavio E. Cumpiano
Villamor

Tribunal de Circuito de Apelaciones: Circuito Regional I

Panel Integrado por:     Hon. López Vilanova
                        Hon. Delgado Hernández
                        Hon. Rodríguez García

Fecha: 10/7/1999

Materia: Laudo


        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Condado Plaza Hotel & Casino

     Recurrido

       v.                                CT-1995-9

Asociación de Empleados de
Casino de Puerto Rico

     Recurrente


Opinión del Tribunal emitida por el Juez Asociado señor CORRADA DEL RIO


San Juan, Puerto Rico, a 7 de octubre de 1999.

En 1981, el Condado Plaza Hotel & Casino (el Hotel) y la Asociación de Empleados de Casino de Puerto Rico (la Asociación) otorgaron un Convenio Colectivo, con fecha de expiración del 31 de octubre de 1984. El 9 de enero de 1985, expirado el convenio, pero antes de la firma del siguiente[1], el Hotel adoptó unas nuevas reglas de conducta, las cuales establecían, entre otras, un programa de detección de uso de sustancias controladas entre empleados.

---

[1] El nuevo convenio colectivo se firmó finalmente el 22 de febrero de 1985.

Como parte de dicho programa, el Hotel contrató a la firma Security Associates el 8 de octubre de 1986, para que llevara a cabo la prueba de urianálisis. El 4 de agosto de 1987, las pruebas administradas a los empleados Sr. Arturo Cátala y Sr. Ramón Moreno, ambos crupieres del Casino, arrojaron un resultado positivo de marihuana y cocaína. Al año siguiente, el 10 de agosto de 1988, éstos fueron sometidos a una segunda prueba, cuyo resultado también fue positivo. El 24 de octubre de 1988, ambos empleados fueron despedidos.

Ante el despido de estos empleados, la Unión les representó en una querella sometida bajo el procedimiento de Quejas y Agravios dispuesto en el Convenio Colectivo. Los casos fueron consolidados el 21 de septiembre de 1989, y se celebraron alrededor de seis vistas ante el árbitro del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos, Sr. Eddie Otero. Clasificados los casos con los números A-10001 y A-10002, el árbitro dictaminó injustificados los despidos. El Hotel respondió el 12 de noviembre de 1991, mediante un recurso de revisión del laudo arbitral presentado ante el extinto Tribunal Superior, Sala de San Juan.

El 27 de febrero de 1995, el Juez Superior, Hon. Flavio E. Cumpiano, declaró con lugar la demanda que impugnaba el laudo recurrido. La notificación de ese dictamen se archivó en autos el 1ro de marzo de 1995.

Inconforme, el 30 de marzo de 1995, la Asociación presentó ante el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, un recurso de apelación. Sin embargo, por entender que se trataba de una cuestión constitucional de alto interés público, dicho foro nos certificó formalmente la controversia de autos el 5 de febrero de 1996, conforme a lo dispuesto por los Arts. 3.002(b) y 3.002(j)(3) de la Ley de la Judicatura de 1994[2] y la Regla 25(b) del Reglamento de este

---

[2] A la fecha en que el foro apelativo certificó ante nos la controversia, la ley permitía que la certificación fuera solicitada no solamente a petición de parte, sino por el propio tribunal. A esos

Tribunal, según entonces vigente. El 12 de abril de 1996, expedimos el mandamiento de certificación en el caso de epígrafe.[3]

## II

La Asociación recurrente plantea dos cuestiones fundamentales en su alegato. En primer lugar, señala que erró el tribunal de instancia al determinar que las pruebas de detección de drogas en las empresas privadas son cónsonas con la política pública del Pueblo de Puerto Rico. Sostiene la recurrente que dichas pruebas, al ser mandatorias, adolecen de vicios de inconstitucionalidad. En segundo lugar, la recurrida plantea que erró el tribunal de instancia al determinar que el laudo arbitral estaba reñido con la política pública del gobierno.

---

efectos, el artículo 3.002(j)(3) de la Ley de la Judicatura de 1994 disponía:

> (j) "[m]ediante auto de certificación, a ser expedido discrecionalmente, *motu proprio,* o a solicitud de cualquier tribunal, podrá tener inmediatamente ante sí para considerar, cualquier asunto pendiente ante otro tribunal cuando:
> (1) ...
> (2) ...
> (3) Se planteen cuestiones de alto interés público, que incluya cualquier cuestión constitucional sustancial al amparo de la constitución del Estado Libre Asociado de Puerto Rico y/o de la Constitución de los Estados Unidos. Ley de la Judicatura de 1994, Leyes de Puerto Rico de 1994, Parte III, pág. 2808.

En la actualidad, a raíz de las enmiendas de las que ha sido objeto la Ley de la Judicatura, el procedimiento para recurrir ante nos a través del auto de certificación está recogido en el Artículo 3.002(g). En este se dispone que:
> "[m]ediante auto de certificación, a ser expedido discrecionalmente, y sólo en circunstancias urgentes y a solicitud de parte, podrá traer inmediatamente ante sí para considerar y resolver, cualquier caso pendiente ante el Tribunal de Circuito de

**...continúa**

---

**...continuación**
> Apelaciones cuando se plantee la inconstitucionalidad de una ley, resolución conjunta, resolución concurrente, regla o reglamento de una agencia o instrumentalidad pública, u ordenanza municipal, al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de la Constitución de los Estados Unidos".

[3] En dicha Resolución, también proveímos no ha lugar a la "Oposición a Que se Expida el Auto de Certificación y Moción de Desestimación" y a la "Moción de Desestimación", ambas presentadas por el Hotel.

De entrada, debemos hacer la salvedad de que en este caso no dilucidamos la constitucionalidad de las pruebas de detección de sustancias controladas en el ámbito privado debido a que dicha discusión resulta innecesaria para resolverlo. El fundamento principal utilizado

por el árbitro para invalidar las pruebas de dopaje realizadas por la recurrida a sus empleados, así como para reinstalarlos a sus puestos de trabajo, fue el hecho de que el Hotel recurrido incumplió con su deber de negociar con la Unión el establecimiento de éstas.

Señaló el árbitro que la parte recurrida puede válidamente establecer un programa confiable de detección de drogas en el empleo a fin de mantener un ambiente de trabajo libre del uso, posesión o tráfico de sustancias controladas. De hecho, el árbitro encomió la labor del patrono de impulsar este tipo de programa. Sin embargo, concluyó que una vez el patrono tomó la decisión de implantar tales nuevas condiciones de empleo, la norma establecida es que éste venía obligado a negociarlas de buena fe con la Unión como parte del Convenio Colectivo suscrito por ambas partes.

Un acuerdo en un convenio colectivo para utilizar el arbitraje como mecanismo de ajuste de controversias, crea un foro sustituto a los tribunales de justicia. En efecto, ello representa una sustitución del juez por el árbitro. *López v. Destilería Serrallés,* 90 D.P.R. 245 (1964). A la interpretación que realiza el árbitro de lo acordado en el convenio se le confiere gran deferencia. *J.R.T. v. Junta Adm. de los Muelles Municipales de Ponce*, 122 D.P.R. 318 (1988).

Al interpretar un convenio, el árbitro no está limitado a su contenido, sino que debe hacerlo a la luz de las normas interpretativas de derecho sustantivo emitidas por el Tribunal Supremo federal y el Tribunal Supremo de Puerto Rico en el campo del derecho laboral. También se reputarán persuasivas las decisiones de otros tribunales de primera instancia y de agencias administrativas, así como los laudos y escritos de árbitros reputados. *J.R.T. v. Vigilantes Inc.,* 125 D.P.R. 581 (1990); *J.R.T. v. Hato Rey Psychiatric Hosp.,* 119 de P.R. 62 (1987).

Finalmente, es una norma claramente establecida que en nuestra jurisdicción, la revisión de laudos de arbitraje laboral está limitada a la existencia de fraude, conducta impropia, falta del debido proceso

de ley, violación a la política pública, falta de jurisdicción, o que el laudo no resuelve todas las cuestiones en controversia. *J.R.T. v. Hato Rey Psychiatric Hosp., supra,* 67-68; *Unión Ind. Licorera v. Destilería Serrallés,* 116 D.P.R. 348, 352-354 (1985).

Sin embargo, cuando las partes pactan que el laudo arbitral sea conforme a derecho, los tribunales podrán corregir errores jurídicos en referencia al derecho aplicable. *J.R.T. v. Junta Adm. de los Muelles Municipio de Ponce, supra,* pág. 326; *SIU de P.R. v. Otis Elevator,* 105 D.P.R. 832, 836 (1987).

En el caso de autos, el convenio colectivo delimita de forma clara e inequívoca el ámbito de autoridad adjudicativa del árbitro.

Dispone el inciso (8) del Art. V del convenio que:

> "La decisión del árbitro será final y obligatoria para todas las partes contratantes así como para todos los empleados cubiertos por este Convenio Colectivo siempre que la misma sea conforme a derecho. Las determinaciones de hechos serán concluyentes, excepto la cuestión de arbitrabilidad procesal, la cual será resuelta en primera instancia por el Arbitro pero podrá ser objeto de revisión judicial. La cuestión de arbitrabilidad sustantiva será determinable por los tribunales a tenor con la doctrina vigente".[4]

---

[4] Sobre las facultades adjudicativas del árbitro el convenio, además, dispone:

ARTICULO V
QUEJAS Y AGRAVIOS

De surgir alguna controversia, de cualquier índole, entre la Unión y el Patrono sobre la interpretación, aplicación o administración de cualquier término o términos de este Convenio Colectivo, o sobre la sanción disciplinaria impuesta a uno o más empleados, dicho asunto debe ser resuelto en forma final y obligatoria conforme al procedimiento acordado en este Artículo; **disponiéndose que controversias sobre los derechos constitucionales de las partes en la Carta de Derechos de la Constitución de Puerto Rico y de los Estados Unidos y sobre la interpretación de estatutos relacionados con estos derechos se reservan para los tribunales de justicia correspondientes.** (El énfasis es nuestro)

4. **La jurisdicción del Arbitro será determinada exclusivamente por los términos de este Convenio Colectivo. El árbitro no tendrá poder o autoridad para extender su jurisdicción para cubrir materias no incluidas en el contrato,** pero sí deberá decidir toda controversia relacionada con el cumplimiento de los pasos procesales que se requieran para traer la misma a arbitraje.

5. **El árbitro no tendrá jurisdicción para alterar, enmendar o modificar las disposiciones de este Convenio y cualquier decisión que viole esta disposición será considerada nula o sin valor alguno.**

La facultad revisora del tribunal de instancia se encontraba limitada a determinar, tomando en cuenta la flexibilidad del árbitro en la interpretación del convenio, si los fundamentos sobre los cuales se apuntaló el laudo eran conforme a derecho y al convenio.

Examinadas las determinaciones del árbitro a la luz de las normas jurisprudenciales de revisión de laudos de arbitraje obrero patronal, las consideramos correctas y, por consiguiente, revocamos la sentencia del tribunal de instancia emitida el 27 de febrero de 1995. Veamos.

### III

La Ley Federal de Relaciones del Trabajo, conocida como la "Labor Management Relations Act", 29 U.S.C.A. sec. 141, *et seq. (*en adelante la LMRA) prohibe que el patrono de obreros unionados efectúe cambios significativos en los "salarios, horas y otros términos y condiciones del empleo" sin antes haber realizado un esfuerzo de buena fe para negociar con los representantes sindicales. *Id.,* sec. 158(d).

Sobre este particular, el *"General Counsel"* del *"National Labor Relations Board" (NLRB)* emitió un memorando el 8 de septiembre de 1987[5], en el cual señaló que:

1. La administración de pruebas de detección de sustancias controladas constituye una materia objeto de negociación mandatoria.

2. El establecimiento de este tipo de pruebas constituye un cambio sustancial en las condiciones de trabajo del obrero, aún cuando el patrono haya requerido anteriormente otros tipos de exámenes físicos y aún cuando éste haya prohibido el uso o posesión de "sustancias intoxicantes" en el empleo.

3. Cualquier renuncia a los derechos de negociación que goza la Unión debe ser clara e inequívoca ("clear and unmistakable").

---

6. **Las funciones del árbitro serán de carácter adjudicativo y no de carácter legislativo**, y éste no tendrá jurisdicción para considerar o resolver cualquier asunto relacionado con la negociación de un nuevo Convenio."

[5] Memorando No. GC 87-5, de septiembre 8 de 1987, 4 Lab. Rel. rep. (BNA), sec. 9344.

4. La política pública tradicional de conferirle deferencia a la determinación arbitral aplica a este tipo de casos.

En el caso normativo sobre esta materia, *Johnson Bateman Co. v. International Ass'n. of Machinists, Local Lodge 1047,* 295 NLRB 180 (1989), la "NLRB" utilizó la definición de lo que constituye una materia objeto de negociación mandatoria, establecida por el Tribunal Supremo federal en el caso de *Ford Motor Co. v. NLRB,* 441 U.S. 488 (1979). Allí se dispuso que son objeto de negociación mandatoria aquellos asuntos *"plainly germane to the `working environment´ [...] not among those `managerial decisions, which lie at the core of entrepreneurial control´"*. *Id.,* pág. 498, citando a *Fireboard Corp. v. NLRB,* 379 U.S. 203, 222-223 (1964).

La Junta resolvió en *Johnson-Bateman Co., supra,* que el establecimiento de una política de detección de uso de estupefacientes para los empleados que hayan sufrido una lesión en el empleo, que pudiera conllevar el despido del empleado que diera positivo en las pruebas de droga, constituye un asunto visiblemente relacionado con el ambiente de trabajo ("plainly germane to the working environment"). Por lo tanto dichas pruebas tenían que ser objeto de negociación colectiva.

Por otro lado, las decisiones gerenciales que "se encuentran en la médula del control empresarial", son aquellas fundamentales a la administración básica de una empresa y que sólo tocan indirectamente el asunto de seguridad del puesto de trabajo. *Fireboard Corp. v. NLRB, supra,* pág. 223.

En ese mismo contexto, la sección 301 de la LMRA, 29 U.S.C. 185, dispone:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in

controversy or without regard to the citizenship of the parties. [...][6].

Para resolver los casos que se originen bajo esta cláusula, la ley a utilizarse ha de ser la federal, quedando la ley estatal desplazada por ésta. *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957). Ello no empece a qué foro se acuda, si el estatal o el federal. *Avco Corp. v. Aero Lodge 735*, 390 U.S. 557, (1968). Para que se le pueda dar fuerza a la política pública que animó la creación de esta norma, el campo que la misma ocupa se tiene que extender más allá de los casos en los que se alegue una violación a un contrato laboral. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985). Dicha política requiere que las relaciones creadas por un convenio colectivo se interpreten y definan por un "evolving federal common law grounded in national labor policy". *Bowen v. United States Postal Service*, 459 U.S. 212, 224-225 (1983). "Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law [...]" *Allis-Chalmers Corp. v. Lueck*, *supra*, pág. 211.

Los derechos y obligaciones dimanantes de las leyes estatales que pueden ser renunciados o alterados mediante contrato, se encuentran desplazados por los propios convenios colectivos. *Allis-Chalmers Corp. v. Lueck*, *supra*, pág. 213. El análisis que debemos realizar para determinar si alguna ley estatal se encuentra desplazada por la sección 301 del LMRA, *supra*, es si dicha ley confiere derechos no negociables a los patronos o a los empleados, o si la evaluación de la reclamación proveniente de dicha ley se encuentra inextricablemente entrelazada (*inextricably interwined*) con los términos del convenio colectivo. *Id.* Lo esencial es determinar si, para resolver la acción que surge de la

---

[6] En este caso no está en controversia que a la parte recurrida, el Hotel, le aplican las disposiciones de la Ley Federal de Relaciones del Trabajo, *supra*.

ley estatal, es necesario interpretar el convenio colectivo. *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399 (1988).

El presente caso surge bajo una reclamación de despido injustificado. No existe controversia en torno al hecho de que los empleados violaron las normas de trabajo enunciadas por el patrono. El despido se encuentra entre las sanciones a imponerse a un empleado que dé positivo en las pruebas de dopaje en dos ocasiones distintas. La unión reclama, sin embargo, que la implantación de dicha regla fue ilegal toda vez que el patrono no negoció la misma con la Unión. El patrono, por su parte, alega que sí negoció la implantación de las normas de trabajo al igual que las pruebas de dopaje.

En *Laws v. Calmat*, 852 F.2d 430 (9th Cir. 1988), un empleado cuestionó la constitucionalidad, por violación al derecho a la intimidad bajo la Constitución de California, de la implantación unilateral por parte del patrono de unas pruebas de dopaje como requisito para permanecer en el trabajo. La Corte de Apelaciones de los Estados Unidos para el Noveno Circuito resolvió en ese caso que, como las condiciones de trabajo se tienen que regular en el convenio colectivo y los programas de detección de drogas en el trabajo son condiciones de trabajo, según definidas en el LMRA, la reclamación se apoyaba sustancialmente en el convenio colectivo. Como consecuencia, la reclamación del empleado tenía que tratarse bajo la sección 301 del LMRA o debía desestimarse por estar desplazada por dicha sección. A igual conclusión se llegó en *Utility Workers of America v. Southern Cal. Edison*, 852 F.2d 1083 (9th Cir. 1988), Cert. Denied 489 U.S. 1078 (1989); *Jackson v. Liquid Carbonic Corporation*, 863 F.2d 111 (1st Cir. 1988); *Schlacter-Jones v. General Telephone of California*, 936 F.2d 435 (9th Cir. 1991); *Stikes v. Chevron USA, Inc.*, 914 F.2d 1265 (9th Cir. 1990), Cert. Denied 500 U.S. 917 (1991).

A tenor con la jurisprudencia anteriormente examinada, es forzoso concluir que debemos analizar la presente controversia como una que surge de la sección 301 del LMRA, *supra,* y aplicar el derecho federal

uniforme en materia de Derecho Laboral. Asimismo, no cabe la menor duda de que hay que examinar e interpretar el convenio colectivo para dilucidar las controversias y determinar si se negoció o no la implantación del programa de detección de sustancias controladas.

En el caso de autos, las reglas establecidas unilateralmente por la recurrida antes de firmar el convenio, disponen lo siguiente en sus partes pertinentes:

"...

13. **NORMAS DE SEGURIDAD Y SALUD**

Todo empleado deberá cumplir con las normas de seguridad y de salud que sean establecidas por el Hotel y las autoridades pertinentes, tales como el Departamento de Salud, Compañía de Turismo de Puerto Rico y Administración de Salud y Seguridad Ocupacional.

Será requisito de empleo someterse a examen médico, Rayos X y análisis de sangre y orina al ingreso del empleado por un médico seleccionado y pagado por el Hotel. En cualquier momento en que las normas de seguridad y salud del Hotel lo requiera como garantía de salubridad y seguridad de los huéspedes y empleados, y/o cada seis meses, se podrá requerir al empleado que repita los análisis de sangre y orina y se someta a examen médico.

**Reconocemos que tenemos un serio problema de drogas en el Hotel. Nos proponemos corregirlo porque afecta nuestra habilidad para operar nuestro negocio dentro del grado de excelencia que nuestros clientes merecen. Queremos ser claros con ustedes. No queremos empleados que usen estupefacientes que no sean medicados. Si se identifica a algún empleado usando drogas, se le dará una sola oportunidad para elegir entre el vicio o su trabajo. Si no se corrige, lo sentimos mucho pero no puede pertenecer a nuestra Familia.** (El énfasis es nuestro)

La gerencia podrá requerir un examen de polígrafo como condición y/o mantenimiento de empleo.

14. [...]

15. **EMBRIAGUEZ O INTOXICACION POR DROGAS**

Está terminantemente prohibido poseer o ingerir bebidas alcohólicas o cualquier clase de droga[s], otra que no sea por prescripción médica, en las dependencias o predios del Hotel dentro o fuera de horas laborables.

Está igualmente proscrito el personarse a trabajar o al Hotel en estado de embriaguez o de intoxicación por narcóticos, aún en casos de drogas por prescripción médica.

> El tráfico de drogas, incluyendo la posesión, uso y venta será causa para el despido del empleado[7].

A tenor con la doctrina enunciada en el caso seminal de *Johnson-Bateman Co., supra,* el árbitro concluyó que las nuevas normas de seguridad y salud adoptadas por el patrono antes de firmar un Convenio Colectivo, eran objeto de negociación compulsoria debido a que establecían nuevas condiciones en el empleo[8].

IV

Ahora bien, la parte recurrida señala que, contrario a lo concluido por el árbitro, sobre las pruebas de detección de sustancias controladas, éstas fueron sometidas a los representantes de la Unión y ellos optaron por rechazarlas, renunciando negociar sobre ellas. Por consiguiente, la Unión estaba impedida de impugnar las pruebas por falta de negociación debido a que había renunciado a ella. No tiene razón.

Ciertamente, es norma reconocida que las uniones pueden renunciar a los derechos de los representados. Ello por cuanto los representantes de los obreros unionados fueron seleccionados libremente y se presume la debida representación. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983); *NLRB v. Allis-Chalmers Manufacturing Co.,* 388 U.S. 175 (1967)[9].

No obstante lo anterior, para que la renuncia sea válida, los tribunales han sido muy estrictos en exigir que la misma haya sido clara e inequívoca ("clear and unmistakable"). Por lo tanto, a menos que de la negociación colectiva surja claramente que ha mediado una renuncia consciente, inequívoca y expresa por parte de los representantes sindicales, los obreros no estarán, de ordinario, privados de los

---

[7] Petición de Revisión ante el Tribunal de Primera Instancia, Sala de San Juan, Apéndice III, pág. 42.

[8] Véase Laudo Arbitraje, pág. 9.

[9] Específicamente, el Tribunal Supremo Federal por voz del Juez Powell, reconoció que:

> "[...] a union may waive a member's statutorily protected rights [...]. (Citas omitidas) Such waivers are valid because they `rest on the premise of fair representation´ and presuppose that selection of the bargaining

derechos a la negociación que les cobijan. *Metropolitan Edison v. NLRB, supra,* pág. 708; *Perkins Machine Co. v. Local 223,* 141 NLRB 98 (1963).

De los autos no surge que los representantes de la Asociación recurrente hubiesen renunciado en forma clara e inequívoca a negociar las reglas sobre detección de sustancias controladas.

Asimismo, el convenio no consigna expresamente una autorización al patrono para realizar las pruebas de detección de drogas. Es por ello que a tenor con la normativa aplicable, concluimos que es inmeritorio el planteamiento de la parte recurrida en cuanto a que la Unión renunció a la negociación de las reglas en torno a las pruebas de dopaje y por lo tanto se veía impedida de impugnarlas.

Salvada esta controversia preliminar, debemos determinar si en efecto las reglas fueron objeto de una negociación de buena fe por parte del patrono como exige la doctrina en materia de convenios colectivos.

Del expediente se desprende que el Hotel no quería negociar las reglas sobre detección de drogas y, de hecho, las adoptó <u>antes</u> de que se firmara el Convenio Colectivo. La Unión en todo momento asumió la posición de que las reglas debían formar parte del convenio. Finalmente, el nuevo convenio fue firmado el 22 de febrero de 1985. Este contenía la siguiente disposición en torno a las reglas de disciplina que la parte recurrida invoca para validar el establecimiento de las pruebas de detección de sustancias controladas:

> **"Artículo XXII (G)** – Los empleados están obligados a cumplir con las reglas de disciplina establecidas por el patrono pero podrán recurrir al procedimiento de quejas, agravios y arbitraje para dilucidar la razonabilidad de las mismas".

El árbitro concluyó en el laudo que esta cláusula era insuficiente para autorizar la imposición del programa de detección de sustancias controladas y que la ausencia de una negociación *bona fide* en torno a las

---

representative `remains free'" (Citas omitidas). *Metropolitan Edison Co. v. NLRB, supra,* pág. 705.

mismas, por ser ésta mandatoria, anula el procedimiento disciplinario establecido por el patrono.

Tal cual señaló el árbitro en el laudo:

"[l]a mera notificación o anuncio de su decisión unilateral de adoptar e instrumentar tal programa no satisface a nuestro juicio el criterio establecido por la Junta sobre su obligación de ley de sentarse a negociar con la Unión sobre tan trascendental cambio en condiciones de empleo a ser efectuado para los miembros de la Unidad Contratante. Consecuentemente, sus actuaciones a la luz de los resultados obtenidos tras la implantación unilateral de un asunto mandatorio de negociación que no discutió con la Unión, no podemos considerarlos como válidas en derecho." Laudo de Arbitraje, pág. 10.

Tomando en consideración la clara doctrina de respetar y conferirle gran deferencia a los laudos arbitrales, consideramos que el razonamiento del árbitro no fue palpablemente defectuoso y que actuó, pues, correctamente al invalidar el programa de detección de sustancias controladas. Ciertamente, no se produjo una negociación *bona fide* sobre las reglas a utilizarse en el programa impugnado por lo que procedía la reinstalación de ambos empleados a sus puestos.

IV

Por último, erró el Tribunal de Primera Instancia al invalidar el laudo arbitral debido a que, según aquel foro, el mismo atentaba contra la política pública en Puerto Rico.

La sentencia dictada por el tribunal de instancia, conflige con la legislación federal vigente al ignorar la obligatoriedad de la negociación colectiva de este tipo de reglamentos, así como la clara práctica judicial de respetar con la mayor deferencia los laudos de arbitraje.

En vista de este resultado, no es necesario entrar a dilucidar la constitucionalidad o razonabilidad del mecanismo utilizado para llevar a cabo las pruebas de dopaje[10]. Su solución no afectaría la determinación

---

[10] Hacemos notar que nuestra Asamblea Legislativa aprobó la Ley Núm. 59 de 8 de agosto de 1997, conocida como la "Ley Para Reglamentar las Pruebas Para la Detección de Sustancias Controladas en el Sector Laboral Privado", la cual no estaba vigente cuando se originó este caso. En su artículo 3 se consigna su propósito como el de "[...] detectar el uso de sustancias controladas por parte del empleado y los candidatos a empleo [...]". Intentan los legisladores con esta ley promover la salud y seguridad de los trabajadores y de la comunidad

última hecha por el árbitro de que todo el proceso es nulo dado que no se negoció en el convenio.

Por todo lo cual, se revoca la sentencia dictada por el tribunal de instancia, y se restablece el laudo de arbitraje.

Se dictará Sentencia de conformidad.

BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO

---

puertorriqueña sin que ello se entienda en menoscabo de las garantías constitucionales que tienen como fin preservar la dignidad e integridad de todos los puertorriqueños.

El artículo 10 de la Ley Núm. 59, *supra,* establece en lo relacionado a su aplicación cuando existen organizaciones obreras, lo siguiente:

"[c]uando exista una organización obrera que represente a los trabajadores en una unidad apropiada de negociación colectiva, debidamente certificada por la Junta Nacional o local de Relaciones del Trabajo, el procedimiento para la administración de pruebas de drogas estará sujeto a lo dispuesto por el convenio colectivo vigente a la fecha de la aprobación de esta ley, una vez expirado el término del convenio, las disposiciones de esta ley serán de aplicación de pleno derecho."

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Condado Plaza Hotel & Casino

    Recurrido

        v.                              CT-1995-9

Asociación de Empleados de
Puerto Rico

    Recurrente

SENTENCIA

San Juan, Puerto Rico, a 7 de octubre de 1999.

Por los fundamentos expuestos en la Opinión precedente, la cual se hace formar parte de esta sentencia, se revoca la sentencia dictada el 27 de febrero de 1995 por el Tribunal de Primera Instancia, Sala Superior de San Juan, y se restablece el laudo de arbitraje de 15 de octubre de 1991.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Naveira de Rodón y el Juez Asociado señor Fuster Berlingeri concurren sin opinión escrita. El Juez Asociado señor Rebollo López no interviene.

                          Isabel Llompart Zeno
                 Secretaria del Tribunal Supremo