El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal en cuanto a los acápites I, II, III, IV y VI. En cuanto a la introducción y al acápite V, estuvieron conformes los Jueces Asociados Señores Martínez Torres, Kolthoff Caraballo, Rivera García y Feliberti Cintrón.
En esta ocasión tenemos la oportunidad de analizar la Ley para Reglamentar las Pruebas para la Detección de Sustancias Controladas en el Sector Laboral Privado (Ley de Prueba de Sustancias Controladas), Ley Núm. 59-1997, 29 LPRA see. 161 et seq. En particular, debemos examinar si el patrono cumplió con ciertos requisitos exigidos por ley para establecer un programa de detección de sustancias controladas.
Asimismo, este caso nos permite reiterar un principio básico de nuestro derecho procesal apelativo: toda parte que interese recibir un remedio a su favor debe acudir al tribunal apelativo correspondiente a solicitarlo. Es decir, un tribunal apelativo no puede otorgar un remedio a una parte que no acudió en revisión.
I
Como en este caso revisamos la denegatoria del foro pri-mario de dictar sentencia sumaria, relataremos los hechos materiales que no están en controversia, según se recogen en la Resolución del Tribunal de Primera Instancia. Apén-dice, págs. 44-56.
El 8 de mayo de 1995, el Sr. Orlando Ortiz comenzó a trabajar para Holsum de Puerto Rico (Holsum). Como parte de sus labores, el señor Ortiz tenía asignada una guagua de carga comercial para visitar a los clientes diariamente. En febrero de 2009, luego de varios años de trabajar en la empresa, el señor Ortiz se sometió a una *515 prueba de drogas que resultó inconclusa porque la muestra de orina estaba diluida. Ante esa situación, se citó al señor Ortiz para que proveyera una segunda muestra de orina, pero presenciada. Esa prueba resultó negativa.
El 4 de febrero de 2010, el señor Ortiz arrojó positivo a cocaína en otra prueba de dopaje requerida por Holsum. Al señor Ortiz se le brindó la oportunidad de acudir a un cen-tro de rehabilitación, según disponía la Ley Núm. 59, supra, y la Política sobre Posesión, Uso y Pruebas para la Detección de Sustancias Controladas y Alcohol de Holsum, Apéndice, págs. 156-169. También se le apercibió que en una segunda ocasión sería despedido.
Al año próximo, específicamente el 24 de enero de 2011, se sometió nuevamente al señor Ortiz a una prueba de dopaje. El resultado de esa prueba fue inválido, porque el laboratorio concluyó que la muestra estaba diluida. Apén-dice, págs. 173 y 180. Por esa razón, se le hizo una segunda prueba el 28 de enero de 2011, la cual arrojó un resultado negativo. Para obtener un resultado más definitivo, Hol-sum ordenó que el señor Ortiz se realizara una tercera prueba de dopaje el 11 de febrero de 2011, esta vez de cabello. Esta prueba arrojó un resultado positivo a cocaína. Debido a que esta fue la segunda ocasión en la que el señor Ortiz arrojó positivo a cocaína, Holsum lo despidió de su empleo.
Ante ello, el señor Ortiz presentó una demanda por des-pido injustificado bajo el trámite expedito que contempla la Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA see. 3118 et seq. Holsum se opuso y presentó una moción de sentencia sumaria. Adujo que no había controversia sobre el resul-tado de las pruebas, por lo que solicitó que se desestimara la demanda, alegando que el despido estaba justificado. El foro primario denegó la moción de sentencia sumaria. De-terminó que la Ley Num. 59, supra, solo permite que se hagan a los empleados dos pruebas al año. Por esa razón, concluyó lo siguiente:
*516 Según la evidencia presentada, el querellante fue sometido a tres pruebas de dopaje durante el 2011; la primera prueba fue considerada inválida por el laboratorio por razones que no sur-gen con claridad del expediente!;] la segunda fue negativa],] y la tercera, arrojó positivo al uso de cocaína. De probarse por parte del patrono que el empleado fue el responsable de que la muestra tomada el 2[4] de enero de 2011 arrojase un resultado inválido [...] no albergamos duda en torno al hecho de que la prueba del [28] de enero de 2011 debería de considerarse, para fines de la aplicación de la Ley de Detección de Sustancias Controladas, como la primera prueba de ese año. [...] Sin embargo, esa es precisamente la duda que asalta la conciencia del tribunal, ante la insuficiencia de la prueba disponible en esta etapa procesal del caso.
A contrario sensu, si no llegase a demostrarse que el em-pleado provocó el resultado inválido de la muestra, adulterán-dola o diluyéndola, [...] deberíamos de concluir que luego del resultado negativo de la segunda muestra tomada el [28] de enero de 2011 Holsum estaba impedido de someter al deman-dante a una prueba adicional [...] (Enfasis en el original su-primido y énfasis suplido). Apéndice, págs. 54-55.
Como se aprecia, el Tribunal de Primera Instancia pa-reció equiparar un resultado inválido a una muestra alte-rada o adulterada.
Inconforme, el 1 de marzo de 2013 Holsum presentó una solicitud de certiorari ante el Tribunal de Apelaciones. Ese foro se negó a expedir el auto solicitado.
Aun en desacuerdo, Holsum presentó la petición de cer-tiorari que nos ocupa. Señala que el Tribunal de Apelacio-nes erró al sostener la decisión del foro primario que pre-suntamente impuso a Holsum un elemento de prueba no contemplado en la Ley Núm. 59, supra, y excesivamente oneroso: demostrar que el empleado fue el responsable de que la prueba de dopaje tuviese un resultado inconcluso. Holsum también nos indica que el foro apelativo interme-dio incidió al no resolver que la conducta del señor Ortiz constituía justa causa para su despido, de acuerdo con la Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA secs. 185a-185m.
*517 El 28 de junio de 2013 ordenamos al señor Ortiz que mostrara causa por la cual no se debía revocar el dictamen del Tribunal de Apelaciones. Nuestra orden se cumplió. Con el beneficio de los argumentos de ambas partes, pasa-mos a resolver.
II
La querella que nos ocupa se presentó al amparo del procedimiento sumario laboral provisto por la Ley Núm. 2, supra. Sobre el particular, en Dávila, Rivera v. Antilles Shipping, Inc., 147 DPR 483, 498 (1999), resolvimos que las resoluciones interlocutorias que se tramitan al amparo de la Ley Núm. 2, supra, no se revisan, excepto en las circunstancias siguientes: (1) cuando el foro primario haya actuado sin jurisdicción; (2) en situaciones en las que la revisión inmediata dispone del caso por completo, y (3) cuando la revisión tenga el efecto de evitar una grave injusticia. Véase, además, Aguayo Pomoles v. R & G Mortg., 169 DPR 36, 45 (2006). Es claro que en este caso aplica la segunda excepción, ya que se nos solicita que dictemos sentencia sumaria a favor del patrono peticionario, lo que dispondría del caso por completo. Es obvio que nuestra jurisdicción no depende del resultado final del recurso. Por ende, no existe ningún impedimento procesal que nos impida atender los méritos de este recurso.
III
A. Es conocido por todos que el “uso y abuso de sustan-cias controladas constituye un serio problema en la socie-dad puertorriqueña contemporánea, de cuyas consecuencias el escenario de trabajo no está inmune”. Soto v. Adm. Inst. Juveniles, 148 DPR 810, 819 (1999).
*518 Cónsono con esa realidad, la Asamblea Legislativa aprobó la Ley Núm. 59, supra. El Art. 2 de esa ley, id., 29 LPRA see. 161 n., establece que su propósito es detectar el uso de sustancias controladas por parte de empleados y candidatos a empleo en el sector privado. Véase, además, Condado Plaza v. Asoc. Emp. Casinos P.R., 149 DPR 347, 363 esc. 10 (1999). Asimismo, se pretende “promover la salud y seguridad de los trabajadores y, consecuentemente de la comunidad en general, proveyendo las salvaguardas necesarias para la protección de la intimidad e integridad personal del individuo afectado”. 29 LPRA sec. 161 n. De esa forma, la aprobación de la Ley Núm. 59, supra, supuso un esfuerzo del Estado para erradicar el uso y tráfico ilegal de sustancias controladas. Alicea v. A.S.E.M., 152 DPR 312, 323 esc. 9 (2000).
El Art. 5 de la Ley Núm. 59, supra, 29 LPRA sec. 161b, contiene los requisitos que debe cumplir todo patrono que desee establecer un programa de detección de sustancias controladas. En síntesis, dispone: (1) la manera como se deben conducir las pruebas a los empleados y candidatos a empleo; (2) la necesidad de que el patrono apruebe un reglamento para la implementación del programa de detección de drogas; (3) el contenido que debe tener el reglamento que se apruebe para ese fin, y (4) quién sufragará los gastos de las pruebas que se realicen.
En lo concerniente, el Art. 5 de la Ley Núm. 59, supra, expresa que “[t]odo empleado podrá ser sometido a un máximo de dos pruebas al año [...]”.29 LPRA sec. 161b(h). Asimismo, ese artículo dispone que en la primera prueba que se haga “no habrá observador presente mientras el empleado provee la muestra [...]”. 29 LPRA sec. 161b(d). Expresa, además, que “se tomará la temperatura de la muestra en presencia del empleado sometido a la prueba, como medida para determinar si la muestra ha sido adulterada. En caso de que se determine la adulteración de una muestra, ésta será descartada y se solicitará al em- *519 pleado que provea una nueva, esta vez ante la presencia de una persona de su mismo sexo [...]”. (Énfasis suplido). íd.
Nótese que el reglamento que el patrono implemente deberá contener una descripción detallada de los procedi-mientos que deben seguirse para realizar las pruebas. 29 LPRA sec. 161b(b). En cuanto a ese asunto, la legislación especifica que “[Z]as pruebas se harán mediante muestra de orina, salvo circunstancias en que no sea posible [...]”. (Én-fasis suplido). 29 LPRA sec. 161b(d).
En el Art. 5 de la Ley Núm. 59, íd., también se dispone que un laboratorio certificado llevará a cabo las pruebas sobre las muestras y que estas se administrarán de acuerdo con los procedimientos analíticos y de cadena de custodia de muestra científicamente aceptables, de modo que se proteja al máximo la intimidad del empleado. Asimismo, el legislador dispuso que las muestras se deben administrar conforme las directrices del programa federal para pruebas de drogas en el lugar de trabajo (Mandatory Guidelines for Federal Workplace Drug Testing Program). íd.
B. La Administración de Salud Mental y Abuso de Sustancias (Substance Abuse and Mental Health Services Administration), adscrita al Departamento de Salud y Servicios Sociales de Estados Unidos (Department of Health and Human Services), es la entidad encargada de publicar periódicamente las directrices para el programa federal de prueba de drogas en el lugar de trabajo (directrices federales). M. Mercado Echegaray, Drug Prohibition in America: Federal Drug Policy and its Consequences, 75 Rev. Jur. UPR 1215, 1270 (2006). Las primeras directrices federales se publicaron en 1988. Véase Mandatory Guidelines for Federal Workplace Drug Testing Program, 53 Fed. Reg. 11970 (11 de abril de 1988). Posteriormente, esas directrices se han revisado en varias ocasiones. Véanse: 59 Fed. Reg. 29908 (9 de junio de 1994); 62 Fed. Reg. 51118 (30 de septiembre de 1997); 63 Fed. Reg. 63483 (13 de no- *520 viembre de 1998); 69 Fed. Reg. 19644 (13 de abril de 2004); 73 Fed. Reg. 71858 (25 de noviembre de 2008).(1)
En lo pertinente, la Sec. 1.5 de las directrices federales, 73 Fed. Reg. 71877, define una muestra adulterada como “un espécimen que ha sido alterado, según se evidencie con resultados que muestren una sustancia que no es un componente normal para ese tipo de espécimen o una concentración anormal de una sustancia endógena”. (Traducción suplida).(2) Por el contrario, se configura un resultado inválido cuando de una muestra no se puede establecer un resultado positivo, negativo, adulterado o sustituido para una droga específica o una prueba de validación de espécimen. íd., pág. 71878.(3) Esas definiciones ponen de manifiesto que una prueba adulterada y un resultado inválido no son sinónimos. En el caso del resultado inválido, no se puede concluir a ciencia cierta si la muestra fue adulterada o si arrojó positivo o negativo a cierta droga.
Por su parte, constituye una prueba cancelada aquel espécimen que es reportado como un resultado inválido por un médico certificado y la persona a la que se hace la muestra no puede explicar alguna razón para ello. 73 Fed. Reg. 71878.(4) Eso puede ocurrir en situaciones en las que el espécimen dividido falla en reconfirmarse o cuando *521 se determina que existe un defecto fatal en el registro fo-rense en particular. De las definiciones citadas se puede concluir que la Sec. 1.5 de las directrices federales sugiere que el empleado es quien tiene que ofrecer una explicación legítima cuando una prueba produce un resultado inválido.
Por otra parte, la Sec. 2.1 de las directrices federales, 73 Fed. Reg. 71879-71880, establece que la orina es el único espécimen que una agencia federal puede recolectar para realizar las pruebas de drogas en el lugar de trabajo. Del historial de las directrices federales surge que el propósito de esa sección era aclarar que a las agencias federales se les prohíbe recolectar cualquier otro tipo de espécimen para realizar las pruebas de drogas en el lugar de trabajo. Véase 73 Fed. Reg. 71860.
La Sec. 13.5 de las directrices federales, 73 Fed. Reg. 71900-71901, contiene unas situaciones que pueden justificar la imposibilidad de recolectar una muestra de orina. Es decir, aunque según las directrices cada caso se evalúa individualmente, existen condiciones médicas que pueden impedir que se realice una muestra de orina. En particular, la Sec. 13.5(a) de las directrices federales dis-pone que una condición médica incluye
[...] una condición fisiológica comprobable (por ejemplo, una disfunción del sistema urinario) o un trastorno psicológico pre-existente que ha sido médicamente documentado; pero no in-cluye alegaciones infundadas de “ansiedad situational” o de deshidratación. Son condiciones médicas permanentes o pro-longadas, las anormalidades fisiológicas, anatómicas o psico-lógicas que, según se ha documentado, existían antes del in-tento de recolección de la muestra y que se consideran como condiciones que no habrán de corregirse o curarse en largo tiempo o, tal vez, nunca. Pueden ser ejemplos, la destrucción (por cualquier causa) del sistema de filtración glomerular que conduzca a un fallo renal; la ruptura traumática y no repa-rada del tracto urinario, o un trastorno psiquiátrico grave re-lacionado específicamente con el sistema genitourinario. Aun-que algunas condiciones médicas agudas o temporales como *522 cistitis, uretritis o prostatitis podrían interferir con la recolec-ción de la muestra por un período de tiempo limitado, no se les puede brindar el mismo trato excepcional que a las condicio-nes permanentes o prolongadas mencionadas en la oración anterior. (Traducción suplida). 73 Fed. Reg. 71900-71901.(5)
Se deduce de la sección antes citada que las circunstan-cias extraordinarias que justifican no realizar una prueba de dopaje con muestra de orina se tienen que relacionar con una condición médica documentada. También se requiere, como norma general, que la condición fisiológica sea permanente o prolongada. Id. Ahora bien, la Sec. 13.5 de las directrices federales, supra, menciona unas condiciones médicas agudas o temporales que pueden interferir con la recolección de la muestra de orina por un período de tiempo limitado. Estas condiciones temporales no pueden tener el mismo trato que las condiciones permanentes. Id.
IV
Al analizar con detenimiento los dictámenes del foro primario y del Tribunal de Apelaciones, así como los alega-tos de las partes, notamos que en ellos se utilizan los tér-minos “adulteración” y “resultado inválido” como si fueran sinónimos. Sin embargo, esa fusión de términos es inco-rrecta conceptualmente y confunde al momento de anali-zar la controversia de autos.
*523 El Art. 5 de la Ley Núm. 59, supra, dispone con claridad que cuando los resultados señalan que una muestra fue adulterada, procede que se descarte y no se tome en cuenta. No obstante, en este caso no podemos fundamentar nuestra decisión en esa disposición legal, porque ella solo abarca las situaciones en que el laboratorio médico certi-fica que una muestra fue adulterada. Aquí se trata de una muestra que arrojó un resultado inválido. Nuestra Asam-blea Legislativa no definió el término “resultado inválido” ni reguló de forma expresa qué ocurre cuando una muestra se cataloga así. Ahora bien, el legislador sí mencionó expre-samente que las muestras se deben administrar conforme las directrices federales. Art. 5 de la Ley Núm. 59, supra.
Procede, entonces, acudir a ese cuerpo reglamentario para dilucidar la controversia que nos ocupa. Después de todo, debemos “imprimir efectividad a la intención del le-gislador y garantizar así que se cumpla con el propósito para el cual fue creada la medida”. Báez Rodríguez et al. v. E.L.A., 179 DPR 231, 244 (2010). Véase, además, Rosario Mercado v. ELA, 189 DPR 561 (2013).
El Tribunal de Primera Instancia denegó la sentencia sumaria por entender que era un hecho material en con-troversia demostrar que el señor Ortiz fue el responsable de que la prueba de dopaje de 24 de enero de 2011 tuviese un resultado inválido. Sin embargo, conforme la definición que contiene la Sec. 1.5 de las directrices federales, supra, en un resultado inválido es imposible saber si una muestra fue adulterada o sustituida, o si arrojó un resultado posi-tivo o negativo para una droga en particular. Por consi-guiente, es insustancial dilucidar quién tuvo la culpa de que la muestra arrojara un resultado inválido. Lo único que está claro es que la prueba no arrojó un resultado ne-gativo y por eso no se le puede contar como si lo hubiera arrojado.
Cónsono con lo anterior, las directrices federales definen una prueba cancelada como aquella en que la muestra es *524 inválida y la persona a quien se le hace la prueba no tiene una explicación para tal resultado. Sec. 1.5 de las directri-ces federales, supra. Se deduce entonces que cuando una muestra arroja un resultado inválido y el donante no puede ofrecer una explicación sobre las razones para su invalidez, procede cancelar la prueba, lo que equivale a descartarla. Resolver de otra forma sería un contrasentido, porque de un resultado inválido no se puede concluir nada.
De los hechos surge que al señor Ortiz se le tomaron tres muestras en un año: el 24 de enero, el 28 de enero y el 11 de febrero de 2011. De acuerdo con lo que hemos discu-tido, la prueba que se realizó el 24 de enero de 2011 debe descartarse porque arrojó un resultado inválido y el señor Ortiz no ofreció una explicación válida para ello. Así pues, para efectos del Art. 5 de la Ley Núm. 59, supra, Holsum estaba facultado para realizar la prueba de dopaje de 11 de febrero de 2011, pues con esta se cumplía con el máximo de dos pruebas al año que faculta la ley.
En este caso, el Tribunal de Primera Instancia concluyó que el único hecho en controversia era si el empleado fue quien causó la invalidez de la prueba. Recordemos que un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 444 (2013); Pepsi-Cola v. Mun. Cidra et al., 186 DPR 713, 756 (2012); S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011); Ramos Pérez v. Univisión, 178 DPR 200, 213 (2010). Ya hemos explicado por qué determi-nar quién causó que la prueba diera un resultado inválido es un hecho inmaterial al momento de dictar sentencia sumaria en este caso. Véanse: Regla 36 de Procedimiento Civil, 32 LPRA Ap. V; SLG Zapata-Rivera v. J.F. Montalvo, supra; Pepsi-Cola v. Mun. Cidra et al., supra, pág. 756; S.L.G. Szendrey-Ramos v. Consejo Titulares, supra, pág. 167; Ramos Pérez v. Univisión, supra, pág. 213.
*525 Ahora bien, nótese que para que proceda una moción de sentencia sumaria no solo se requiere la inexistencia de hechos en controversia, sino que la sentencia tiene que proceder conforme al derecho sustantivo aplicable. Regla 36.3(c) de Procedimiento Civil, 32 LPRA Ap. V; Ramos Pérez v. Univisión, supra, pág. 215. Por eso, el proponente de la moción de sentencia sumaria debe establecer su derecho con claridad. Abrams Rivera v. E.L.A., 178 DPR 914, 932 (2010); Ramos Pérez v. Univisión, supra, pág. 213.
Es un hecho incontrovertido que la prueba de dopaje de 11 de febrero de 2011, que dio positivo a cocaína, se realizó con una muestra de cabello. Esa actuación del patrono co-lisiona con el texto cristalino del Art. 5 de la Ley Núm. 59, supra, que establece que “las pruebas se harán mediante muestra de orina, salvo circunstancias en que no sea posible”. (Énfasis suplido). 29 LPRA sec. 161b(d). Del expediente no surgen condiciones médicas, según ese término se define en la Sec. 13.5 de las directrices federales, supra, que justificaran desviarse del mandato que establece el Art. 5 de la Ley Núm. 59, supra. Es decir, entre los hechos incontrovertidos que aparecen en la moción de sentencia sumaria no se mencionan condiciones médicas prolongadas o temporales —según se recogen esos términos en las directrices federales— que impidieran que la prueba de dopaje de 11 de febrero de 2011 se realizara con una muestra de orina. Por tal razón, Holsum no podía realizar la prueba de dopaje con una muestra de cabello.
Ante ese escenario, no podemos tomar en consideración el resultado de esa prueba, pues no se realizó según dis-pone el Art. 5 de la Ley Núm. 59, supra. Adviértase que Holsum alegó en la moción de sentencia sumaria que exis-tía justa causa para el despido por el hecho de que el señor Ortiz había arrojado positivo a cocaína por segunda vez en la prueba de dopaje de 11 de febrero de 2011. Como esta-mos impedidos de tomar en consideración el resultado de *526 esa prueba ilegal, el planteamiento de justa causa que es-grimió Holsum es improcedente. De todas las pruebas que se le realizaron el señor Ortiz, solo podemos tomar en con-sideración la segunda que se efectuó el 28 de enero de 2011, y que arrojó un resultado negativo.
En su consecuencia, como cuestión de derecho, no pro-cede dictar sentencia sumaria a favor del patrono Holsum. Art. 2 de la Ley Núm. 80, supra, según enmendada, 29 LPRA sec. 185b.
V
Conviene recordar que nuestro ordenamiento jurídico permite que se dicte sentencia sumaria en contra de la parte que la solicita, siempre que no existan hechos materiales que estén en controversia. P.A.C. v. E.L.A. I, 150 DPR 359, 374 (2000); Col. Ing. Agrim. P.R. v. A.A.A., 131 DPR 735, 782 (1992). Sin embargo, principios elementales de derecho procesal apelativo impiden que en este caso seamos nosotros quienes dilucidemos —en primera instancia— si procede dictar sentencia sumaria a favor del señor Ortiz.
Es norma básica de nuestro derecho procesal apelativo que todo escrito presentado ante un tribunal apelativo señale, discuta y fundamente el error o los errores que se le imputan al foro apelado o recurrido. Morán v. Martí, 165 DPR 356, 366 (2005). Es decir,
[s] olamente mediante un señalamiento de error y una discu-sión fundamentada, con referencia a los hechos y las fuentes de derecho en que se sustenta, podrá el foro apelativo estar en posición de atender los reclamos que se le plantean. (Enfasis suprimido). Id.
Asimismo, para poder presentar los distintos escritos apelativos se tienen que pagar los derechos arancelarios correspondientes. Véase In re Aprobación Der. Arancela *527 rios R.J., 179 DPR 985 (2010). Sobre el particular, la See. 5 de la Ley Núm. 17 de 11 de marzo de 1915, 32 LPRA sec. 1481, establece que serán nulos todos los documentos judiciales a los que no se adhieran los sellos de rentas internas requeridos. Véanse, además: Meléndez v. Levitt & Sons. of P.R., Inc., 106 DPR 437, 438 (1977); Maldonado v. Pichardo, 104 DPR 778, 781-782 (1976); Vázquez v. Rivera, 69 DPR 947, 951 (1949).
Por ende, los foros apelativos no pueden considerar una controversia que no fue planteada, a menos que sea necesario para evitar una injusticia manifiesta. Depto. de la Familia v. Shrivers Otero, 145 DPR 351, 358 (1998). Véanse, además: E.L.A. v. Northwestern Selecta, 185 DPR 40, 55-56 (2012); ABA, Standards Relating to Appellate Courts, Commentary Sec. 3.00, págs. 23-28 (1994). Dicho de otro modo, los tribunales apelativos deben resolver solamente “los asuntos que se le plantean en los recursos que tengafn] ante su consideración”. (Enfasis suprimido). Depto. de la Familia v. Shrivers Otero, supra, pág. 359.
La norma anterior se debe a que nuestro derecho es de naturaleza rogada. Vilanova et al. v. Vilanova et al., 184 DPR 824, 846-847 (2012); Pueblo v. Pérez, 159 DPR 554, 560 (2003); J.A. Cuevas Segarra, Tratado de derecho procesal civil, 2da ed., San Juan, Publicaciones JTS, 2011, T. IV, pág. 1256. Recordemos que “los tribunales son organis-mos que resuelven las disputas que se suscitan entre los ciudadanos y que sean llevadas ante su consideración, sin que les sea dable intervenir motu proprio en tales disputas”. R. Elfren Bernier y J. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Publicaciones JTS, 1987, pág. 3.
El hecho de que nuestro sistema de derecho sea de naturaleza rogada implica que, como norma general, este Foro solo puede revisar las controversias sobre las cuales pasó juicio el Tribunal de Apelaciones. Cestero Aguilar v. Jta. Dir. Condominio, 184 DPR 1, 22 (2011). Ello se *528 debe a que “nuestra competencia apelativa en recursos de certiorari se limita a revisar las sentencias o resoluciones emitidas por el Tribunal de Apelaciones”. íd. Véase, ade-más, Art. 3.002 de la Ley Núm. 201-2003, según enmen-dada, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, 4 LPRA sec. 24s.
En este caso, el patrono Holsum es quien ha solicitado en todos los foros competentes que se dicte sentencia su-maria a su favor. En ningún momento el señor Ortiz ha hecho un planteamiento similar. No lo hizo ante el foro primario ni ante los foros apelativos. En atención a la na-turaleza rogada de nuestro derecho, nos limitamos a decla-rar “no ha lugar” la moción de sentencia sumaria que pre-sentó Holsum y devolvemos los autos al Tribunal de Primera Instancia para la continuación de los procedi-mientos de forma consecuente con nuestros pronuncia-mientos. No podemos resolver este asunto sin que ningún foro de jerarquía inferior lo haya considerado primero y sin que la parte recurrida lo haya solicitado y, mucho menos, argumentado. Eso borraría las distinciones entre este Foro y el Tribunal de Primera Instancia, y cercenaría el derecho de la parte afectada a apelar cualquier dictamen final en su contra. Véase, en general, Crespo Quiñones v. Santiago Velázquez, 176 DPR 408 (2009).
VI
Por los fundamentos expuestos, se expide un auto de “certiorari”, se confirma la determinación del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para procedimientos posteriores compatibles con lo resuelto aquí.
El Juez Asociado Señor Estrella Martínez hizo constar la expresión siguiente:
El Juez Asociado Señor Estrella Martínez está conforme con las Partes I, II, III, IV y VI, y concurre con la Parte V de la *529 Opinión de este Tribunal. Como bien reconoce la mayoría en la Parte V de la Opinión, nuestro ordenamiento jurídico permite que se dicte sentencia sumaria en contra de la parte que la solicita, siempre que no existan hechos materiales que estén en controversia. Sin embargo, a renglón seguido, pautan inne-cesaria y erróneamente que la naturaleza rogada de nuestro sistema de derecho impediría a este Tribunal conceder ese re-medio a una parte que le asista ese derecho, si acude como parte recurrida. Estas expresiones constituyen obiter dictum, ya que en el caso ante nos el empleado recurrido nunca ha solicitado que se dicte sentencia sumaria a su favor y se ha opuesto a que se emita. Este entiende que es necesario que el foro primario escuche su testimonio por existir —reconocido por él— controversias materiales y pertinentes que impiden disponer el caso sumariamente. Ante ese cuadro, resulta inne-cesaria la discusión de la Parte V de esta Opinión, Sobre todo cuando echan por la borda la máxima de que aunque nuestro ordenamiento el Derecho es rogado, ello no impide conceder el remedio procedente. Los tribunales siempre debemos conceder lo que proceda en Derecho, que puede o no coincidir con lo que se solicita. Como el empleado recurrido es el primero en reco-nocer que existen hechos materiales en controversia, no esta-mos ante el caso adecuado para evaluar si este Tribunal tiene la potestad de dictar, por proceder en Derecho, un remedio sumario a favor de la parte contraria a la peticionaria al no existir controversias de hecho.
La Jueza Asociada Señora Fiol Matta concurrió sin opi-nión escrita. El Juez Presidente Señor Hernández Denton emitió una opinión disidente, a la que se unió la Juez Aso-ciada Señora Rodríguez Rodríguez. La Jueza Asociada Se-ñora Pabón Charneco no intervino.

 Las guías actuales están publicadas en 73 Ped. Reg. 71858 (25 de noviembre de 2008) y entraron en vigor el 1 de octubre de 2010. Véase 75 Ped. Reg. 22809 (26 de abril de 2010).

 El texto original en inglés es el siguiente: “A specimen that has been altered, as evidenced by test results showing either a substance that is not a normal constituent for that type of specimen or showing an abnormal concentration of an endogenous substance”.

 El texto original es el siguiente: “The result reported by an HHS-certified laboratory [...] when a positive, negative, adulterated, or substituted result cannot be established for a specific drug or specimen validity test”.

 El texto original en inglés es el siguiente:
“Cancelled Test. The result reported by the MRO to the Federal agency when a specimen has been reported to the MRO as invalid result (and the donor has no legitimate explanation) or rejected for testing, when a split specimen fails to reconfirm, or when the MRO determines that a fatal flaw or unrecovered correctable error exists in the forensic records (as described in Sections 15.1 and 15.2)”.

 El texto original en inglés es el siguiente:
“For purposes of this section, a medical condition includes an ascertainable physiological condition (e.g., a urinary system dysfunction) or a medically documented pre-existing psychological disorder, but does not include unsupported assertions of ‘situational anxiety or dehydration. Permanent or long-term medical conditions are those physiological, anatomic, or psychological abnormalities documented as being present prior to the attempted collection, and considered not amenable to correction or cure for an extended period of time, if ever. Examples would include destruction (any cause) of the glomerular filtration system leading to renal failure; unrepaired traumatic disruption of the urinary tract; or a severe psychiatric disorder focused on genitor-urinary matters. Acute or temporary medical conditions, such as cystitis, urethritis or prostatitis, though they might interfere with collection for a limited period of time, cannot receive the same exceptional consideration as the permanent or long-term conditions discussed in the previous sentence”.